## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

CHRISTINA  PAYLAN,  M.D.                           **CASE NO: 1:15-cv-159**

        Plaintiff,

v.

SCOTT TEITELBAUM, MD, in his individual and official
capacities, UNIVERSITY OF FLORIDA BOARD OF
TRUSTEES, a state-operated entity.

        Defendants,

_____/

### AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF; JURY TRIAL DEMANDED

      **COMES NOW**, Plaintiff, CHRISTINA PAYLAN, MD, (hereinafter as "Dr.

Paylan"), hereby files her Amended Complaint and sues Defendants, SCOTT L. TEITELBAUM,

MD and UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, and alleges:

### CAUSE OF ACTION

1.      This is an action brought pursuant to 42 U.S.C § 1983 for violation of the U.S. Const.

amend. IV and XIV, Florida Statutes, and for violation of Florida Const. Article I §§ 2, 9 and 12

and pursuant to state claims of false imprisonment, fraud and defamation by both slander and

libel.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction of this action under 42 U.S.C § 1983 and its pendent

jurisdiction for state law claims. Jurisdiction is proper in this Court pursuant to  28 U.S.C. §

1343(a)(3),  28 U.S.C. § 1331, and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201

and 2202.

3.      This is an action for damages that exceed $75,0000 exclusive of interest, costs and attorneys' fees. Complaint seeks both compensatory and punitive damages.

4.      All actions took place within the Northern District of Florida in Gainesville, Florida and as such venue is proper within the Northern District of Florida

**PARTIES**

5.      At all times relevant to this Amended Complaint, Plaintiff, CHRISTINA PAYLAN, MD, was and is  a surgeon specializing in cosmetic surgery  in Hillsborough County, Florida.

6.      At all times relevant to this Amended Complaint, Defendant, SCOTT TEITELBAUM, MD, (hereinafter as "Defendant Teitelbaum") was the medical director of  the Florida Recovery Center, and employee of University of Florida Board of Trustees, and is sued in his individual and official capacities.

7.      At all times relevant, University of Florida Board of Trustees (hereinafter as "UF Board of Trustees") was, and is a state university of the State of Florida, operating as a public university, located within the State of Florida, and was, and is an employer of Defendant SCOTT TEITELBAUM, MD.

8.      At all times relevant, Florida Recovery Center (hereinafter as "FRC") is the center from which Defendant, SCOTT TEITELBAUM, MD, operated and engaged in the misdeeds referenced to in this lawsuit.

**GENERAL ALLEGATIONS**

9.      Florida Recovery Center, ("FRC"), is a state operated health care facility in  the Gainesville area which provides services related to rehabilitation and treatment of drug addiction.

10.     University of Florida Board of Trustees derived financial gain  from the operation of Florida Recovery Center, to which Defendant SCOTT TEITELBAUM, MD was designated as a medical director.

11.     Defendant Teitelbaum's  past is checkered when it comes to substance abuse. He was disciplined by the State Medical Board of Connecticut for issues relating to drug addiction which he battled for  nearly two decades when he practiced as a pediatrician in the State of Connecticut.

12.     The Professional Network for Professionals (hereinafter as "PRN")  contracts with FRC for the purpose of having licensed physicians with the Florida Board of Medicine evaluated whenever allegations of substance abuse are lodged against a physician.

13.     Defendant Teitelbaum, himself, was under a PRN contract for seven years for the diagnosis of his cocaine addiction.

14.     In October of 2010, Dr. Paylan became engaged to be married to Mr. Joseph Abdo, (hereinafter as "Mr. Abdo"). Mr. Abdo was a wealthy man who owned a lucrative internet company. Mr. Abdo provided financial assistance to his siblings out of  his generosity. The siblings did not own any legal shares or rights to Mr. Abdo's company. A sibling rivalry between Mr. Abdo and his brother, Khalil Abdo,  had been ongoing for decades.

15.      In August of 2010, a family dispute broke out among members of the Abdo family when Mr. Abdo announced that he would be terminating  their financial assistance.  The family members attributed their financial cut-off by Mr. Abdo to Dr. Paylan and to the upcoming wedding planned between Mr. Abdo and Dr. Paylan. By late August 2010, the family members began a vindictive campaign of retaliation against Dr. Paylan in order to remove her from Mr. Abdo's life.  The siblings began to falsify and disparage Dr. Paylan to the media, to law

enforcement and to licensing agencies in order to execute their masterplan of removing Dr. Paylan from Mr. Abdo's life.

16.    Defendants in this action became involved in this family saga when they became involved as the entity and individuals to exonerate Dr. Paylan of the false allegations made by disgruntled family members regarding alleged drug abuse, drug addiction by Plaintiff when the financial assistance was stopped to these disgruntled family members by Mr. Abdo.

17.    One of the disgruntled family members was Michael Quill, (hereinafter as "Quill") who was also a member of the Tampa Police Department, and the brother-in-law of Mr. Abdo, married to Mr. Abdo's youngest sister. Starting in August 2010, Quill became increasingly concerned over the potential financial losses that he would face resulting from the termination of stipends from Mr. Abdo. In fact, Quill, along with other family members, were unduly blaming the upcoming marriage of Dr. Paylan and Mr. Abdo as the reason for their financial troubles.

18.    Because Quill, as a Tampa Police Reserve Officer, knew a thing or two about police work, DEA, narcotics, and doctors, he told family members that the best way to get rid of Dr. Paylan was to make complaints of her mishandling drugs at her office, and to fabricate the story that Dr. Paylan was drugging Mr. Abdo, making him so drugged and out of his mind that Mr. Abdo had lost his faculties and had decided to end the "hand-out" money to his family. The irony was that due to the numerous fail-safeguards in the system and at the Tampa Police Department, Quill's  illogical plan actually almost worked.

19.    With Quill's police background and skills, disgruntled siblings began to design a plan to eliminate Dr. Paylan out of the picture and out of Mr. Abdo's life  by making false complaints with the Tampa Police Department that Dr. Paylan was inappropriately drugging Mr. Abdo and

that Mr. Abdo had become incompetent by virtue of being drugged by Dr. Paylan such that he could no longer be in charge of his multi-million dollar company.

20.     Based upon these false charges by Quill, Dr. Paylan and Mr. Abdo were arrested at their residence on June 9, 2011 by the Tampa Police Department. The criminal investigation was initiated and propagated by Quill. It was this arrest which triggered the investigation by the Department of Health/Florida Board of Medicine, which then through PRN, required Dr. Paylan to visit Florida Recovery Center in order to rule out these false allegations of drug abuse.

21.     Plaintiff made two trips to the Florida Recovery Center, one on July 20, 2011 and the other on August 2, 2011. The first one was short-lived as Plaintiff ran out of Shands Hospital when she was told that there were orders by Defendant Teitelbaum who had never before met with Plaintiff, for Plaintiff to be admitted to the 'lock-down' unit at Shands Psychiatric Hospital. Objecting vehemently, Plaintiff asked staff to verify whether this order left by Defendant Teitelbaum was indeed correct, and when it was verified that it was, Plaintiff immediately left the premises, believing at first that it must still be an error on the part of the staff, not a direct order from Defendant Teitelbaum. Plaintiff would soon find out that this was not staff error, and indeed a direct order by Defendant Teitelbaum.

22.     The next day Plaintiff contacted Defendant Teitelbaum's assistant, Nancy Goodwin, who had been her contact person for the arrangements and informed Ms. Goodwin of the horrific experience Plaintiff had regarding the orders to be admitted to the "lock- down" unit during the night when she arrived at the premises. Ms. Goodwin relayed to Plaintiff that it had indeed been an error and that reportedly this mistake had occurred because of the night shift staff not exactly being familiar with the procedures at the Florida Recovery Center.

23.     Plaintiff was persuaded by Nancy Goodwin to make a second appointment but not before memorializing her understanding of what her expectations were for the second trip in a letter to all involved in this matter.

24.     It is of note that Plaintiff had been fully functional and extremely busy with her patients so much so that she could not leave her clinic till late each evening and was working over 90 hours per week.

25.     After reassurance by Ms. Goodwin that all had been a mistake, Dr. Paylan believed that her second trip to the Florida Recovery Center would be a short one resulting in immediate diagnosis of the absence of any drug addiction or drug abuse on her part, and that she would be on her way back to Tampa to attend to her busy schedule of surgeries for her patients.

26.     Unfortunately, this is not what happened.

27.     Shortly after her second arrival at the Florida Recovery Center, on or about August 2, 2011, Plaintiff was told to pay a sum of three thousand dollars ($3000.00) and was told that the amount was for running diagnostic tests to rule out substance abuse disorder.  To date, these monies have not been returned to Plaintiff despite the fact that Plaintiff was never subjected to any standardized and medically accepted testing approved by the Board of Psychiatry, and specifically by the Board of Addiction Medicine in the diagnosis and management of patients suspected to have substance abuse disorders.

28.     Then, without consent, and in violation of Plaintiff's right to be free from unlawful search and seizure, Plaintiff 's person, purse and suitcases were searched  by a staff member at the Florida Recovery Center. A cell phone, iPad, and toiletry items, including but not limited to hair spray bottles, nail polish and other canned bottles commercially available for hair and body care and wash, were seized from Plaintiff's suitcases. These items were not returned to Plaintiff and

were retained at the Florida Recovery Center. Only months later, were these items returned and only after repeated requests to have Defendants return the items to Plaintiff, did Plaintiff regain possession of her personal property.  There was no lawful basis to search Plaintiff and/or to seize her possessions.

29.     Following this unlawful and unconsented search, Plaintiff was told to enter a room full of other visitors. This appeared to be a group therapy session. Plaintiff objected to attending to any therapy session, reiterating again, that there had not yet been any diagnosis of her with any substance abuse disorder. Plaintiff requested to speak with Defendant Teitelbaum immediately in order to clarify what Plaintiff again believed to be confusion. Staff at the Florida Recovery Center informed Plaintiff that Defendant Teitelbaum was not available to speak with Plaintiff.

30.     However, when Plaintiff began to boisterously speak about how treatment was being instituted on all new arrivals like herself without any diagnosis and that the $3000 taken was 1000 percent markup and excessive in nature,  for hair and blood testing for the presence of controlled substances, Defendant Teitelbaum suddenly did become available.

31.     Years later, witnesses who were present during this incident at the Florida Recovery Center would testify that Plaintiff calmly and methodically relayed her concerns to Defendant Teitelbaum and that at no point, did Plaintiff appear to be incoherent or not in control of her faculties. Various staff would corroboratingly testify that while Plaintiff was firm, she was not belligerent nor was she loud.

32.     Once Plaintiff expressed her concerns about being shoved into a group therapy session without first undergoing any diagnostic tests to rule out a substance abuse disorder,  the next thing that  happened was the Marchman Act which Defendant Teitelbaum instituted against Plaintiff.

33.     During the verbal exchange with Plaintiff, Defendant Teitelbaum claimed that  he was "God", that he could do whatever he wanted,  and that he had the power to take away Dr. Paylan's medical license. Dr. Paylan objected to Defendant Teitelbaum's  statements and indicated that she would proceed with a formal lawsuit against Defendant Teitelbaum for threatening her in the manner that he was.

34.     Plaintiff's objections angered Defendant Teitelbaum and Defendant Teitelbaum began a campaign wherein he disparaged and defamed Plaintiff, to the media, to professionals associated with FRC, to the Board of Medicine and the Department of Health.

35.     In retaliation and in furtherance of his position that Defendant Teitelbaum believed himself to be "God" and to be able to take away Dr. Paylan's medical license, Defendant Teitelbaum began to write false medical reports, used fabricated information to fill out official University forms under oath in order to falsely justify placing Plaintiff  under a Marchman Act. Teitelbaum also got on the phone and solicited false medical reports from other individuals, such as Dr. David Myers, Dr. Michael Herkov and Dr. William Greene, and then shockingly,  falsely claimed that a videotape of Dr. Paylan was in his possession, custody and control which purportedly showed  Dr. Paylan injecting a controlled substance known as Demerol into her veins, with the videotape allegedly depicting "Demerol bottles strewn around" Plaintiff

36.     The detainment, false imprisonment, false confinement and false labeling of Dr. Paylan as a drug addict was made more plausible, feasible and deceptively more justifiable by the fabrication of Defendant Teitelbaum's false medical reports, solicitation of false medical reports, falsifying official University documents to substantiate a Marchman Act, and the alleged presence of a videotape which purportedly depicted Plaintiff injecting herself with Demerol.

37.     The institution of the Marchman Act led to the arrival of University Police who, then, unlawfully transported Dr. Paylan to a psychiatric unit at Shands Hospital across the street from Florida Recovery Center. Dr. Paylan was subsequently unlawfully admitted into the Psychiatric Unit and kept there against her will for more than 8 hours. The Psychiatric Unit at Shands is a "lock-down" unit and access in and out of the unit is restricted and all persons who are admitted into the unit are not free to leave.

38.     The sole purpose of the Marchman Act was for Defendant Teitelbaum to prove to Dr. Paylan who was really in charge, and who had the ultimate power in the situation. Dr. Paylan continued to protest to the lack of diagnostic tests and tools and the lack of any evaluation and assessment of Dr. Paylan prior to her forcible admission into this psychiatric unit against her will.

39.     Dr. Paylan's admission, as just one of at least 20 admissions that day, served Defendant Teitelbaum's  own self-interest, both financially and professionally. Nearly of 20 individuals who were present at the Florida Recovery Center that day began to have similar complaints about being treated without a proper diagnosis first, but all 20 individuals did not want to be in the situation that Plaintiff found herself in with Teitelbaum fabricating evidence in order to justify an admission to a "lock-down" psychiatric unit.    Defendant Teitelbaum did not delay in relaying to other new arrivals that what happened to Plaintiff could happen to them if they protested.

40.     Plaintiff was ultimately released from the psychiatric unit eight hours later and was returned to her car when she immediately left the premises of Florida Recovery Center.

41.     Subsequently, Defendant Teitelbaum published false statements about Plaintiff to media as well as to Florida Recovery Center Staff, to the Department of Health and to other evaluators,

describing Plaintiff as being in denial and refusing treatment. This information by Teitelbaum that Plaintiff was in denial generated a very disparaging newspaper article about Plaintiff, depicting Plaintiff as being in denial due to an alleged drug abuse problem, in the same manner that denial is attributed to those who do have substance abuse problems. This article permanently and irreparably harmed Plaintiff's good reputation in the community, labeled her as a drug addict, who was running away from treatment because she was in denial. All of it was false and fabricated by Defendant Teitelbaum.

42.     Subsequent to the Marchman Act, and subsequent to Plaintiff's release eight hours later, on or about August 2, 2011, despite having instituted no diagnostic testing, Defendant Teitelbaum forwarded a false medical report to the Florida Board of Medicine in order to get Dr. Paylan's medical license suspended.

43.     Based on the false and retaliatory report from Defendant Teitelbaum, Dr. Paylan's medical license was suspended by the Florida Board of Medicine.

44.     Months after the second visit, a state circuit court judge would find that it was improper to institute treatment before a diagnosis was made during Plaintiff's visit to the Florida Recovery Center in August and would order Teitelbaum and the Florida Recovery Center to first diagnose and then, if necessary, make recommendations for potential treatment.

45.     The third visit by Plaintiff in October of 2011 was under court order by circuit court Judge Pendino, and the experience was markedly different than the other two visits. Plaintiff was subjected to a number of psychological tests and met with different staff who evaluated these tests. The test results from the staff resulted in the conclusion that Plaintiff did not have any substance abuse disorder. However, Defendant Teitelbaum, nevertheless, still made attempts to

disguise these results, by altering the test results and the evaluation of the staff , fabricating additional  information in order to justify his position.

46.     Eight months later, the suspension of Dr. Paylan's medical license was lifted with the finding that Dr. Paylan had no drug addiction or substance abuse problems and that the suspension had been instituted in error.

47.     UF Board of Trustees have a practice and custom of deficiently training its agents such that the custom may be deemed the official policy of the University of Florida, and the failure to instruct, train and properly supervise Defendant Teitelbaum occurred and continued for long enough such that UF Board of Trustees' failure to act and correct the procedure caused or substantially contributed to the unlawful detainment, search and seizure and false imprisonment of Dr. Paylan.

48.     An incestualized custom and practice existed and continues to exist at Florida Recovery Center, owned and operated by UF Board of Trustees, then and  to date, where treatment of those who are referred to the Center is instituted immediately upon arrival and without first the proper diagnostic tools to correctly determine whether a substance abuse disorder is indeed present. The incestualized custom and practice had monetary motive where UF Board of Trustees enjoyed and continue to enjoy substantial financial gain and monopoly by compelling and instituting treatment at the threat of telling professionals that they will lose their licenses and be subjected to all kinds of criminal charges.

49.     The incestual and conflicted nature of the set-up at Florida Recovery Center is evident from the half-way apartments which the Florida Recovery Center has reserved for all new arrivals, irrespective of and prior to any results of diagnostic testing for new arrivals. The immediate goal and agenda by Defendants is to get all new arrivals checked in to these half way

apartments and submit them to therapy without any evaluation or testing to confirm diagnosis of substance abuse disorder. The set up serves financial needs of Defendants, at the expense of the new arrivals.

50.    All visitors to the Florida Recovery Center are expected to first pay $3000 upon arrival and then without a diagnosis and without undergoing any of the necessary tests for the determination of substance abuse disorder, visitors are expected to make a 3-month commitment to stay at a whopping approximate cost of $60,000.  If visitors object like Plaintiff did to this process, they are threatened with the loss or suspension of their medical or law licenses.

51.    The Center is run by Defendant Teitelbaum and these practices are mainly aimed at professionals who are a prime target for Teitelbaum who knows the right buttons to push as most of these professionals have so much to lose by the threat from Teitelbaum to get their medical or law licenses suspended or revoked. Ninety nine percent of the professionals comply with Teitelbaum's scam. Plaintiff did not and suffered monumental losses professionally and financially,  which to date continue for Plaintiff.

52.    The half-way apartments generate substantial income for Defendant UF Board of Trustees and full occupancy at these half-way apartments is a contributing factor in Defendant Teitelbaum being eligible for monthly bonuses in the amount as high as $30,000 for Defendant Teitelbaum.

53.    After her experience, Plaintiff wrote numerous letters to University of Florida Officials, including but not limited to Defendant Teitelbaum contesting the unlawful practices, customs and policies  adopted  in the operation at the Florida Recovery Center. Plaintiff's letters of complaints fell on deaf ears. Not only was there no response to Plaintiff's letters, but there was

also nothing that was done to rectify or correct these unlawful practices at the Florida Recovery Center.

54.     Proper and timely notice of this claim, as required, has been made to all Defendants, as well as any and all conditions precedent for said action have been met.

## CAUSES OF ACTION

### COUNT I- 42 U.S.C § 1983  Cause of Action
### FABRICATION OF EVIDENCE
#### (Against All Defendants)

55.     By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

56.     The detainment, false imprisonment, and false labeling of Dr. Paylan as a drug addict was based on fabricated evidence which Defendant Teitelbaum claimed he had in the form of a videotape which purportedly showed Dr. Paylan injecting a controlled substance known as Demerol into her veins.

57.     No   such videotape existed and Defendant Teitelbaum knew that the videotape did not exist, yet, in reckless disregard, and with ill will, and wanton, Defendant Teitelbaum asserted that such a videotape existed in order to justify placing Plaintiff under a Marchman Act. In doing so, Defendant Teitelbaum caused the unlawful confinement of Dr. Paylan in a restricted, and "lock- down' Psychiatric Unit at the premises of University of Florida, Shands Hospital, where Plaintiff was placed among those with patients who have mental illness some of whom carried the diagnosis of being dangerous to self and to others.

58.     Defendant Teitelbaum also engaged in the systematic institution of a treatment plan for substance abuse before diagnosing Dr. Paylan appropriately with any drug addiction or substance

abuse disorder.  Bypassing the step for diagnosis was for the financial benefit of Defendant

Teitelbaum and Defendant UF Board of Trustees.

59.     Defendant Teitelbaum also fabricated and solicited false medical reports of substance

abuse about Plaintiff after the fact in an effort to justify his false imprisonment of Dr. Paylan.

60.     The false detainment, the false confinement and the false imprisonment of Dr. Paylan

was at the hands of Defendant Teitelbaum who, among other things

> a.   Conspired, confederated and contributed to the false imprisonment by fabricating
>
>      evidence that a videotape existed showing Dr. Paylan injecting herself with the
>
>      substance known as Demerol,
>
> b.   Conspired, confederated and contributed to the false imprisonment and
>
>      confinement by fabricating false medical reports and by soliciting the fabrication
>
>      of false medical reports from those health care professionals who were not
>
>      authorized to receive any information about Dr. Paylan's medical evaluation,
>
> c.   Intentionally omitted material facts from reports, official University documents
>
>      which Teitelbaum signed under oath, in order to bolster false claims for the
>
>      Marchman Act.

61.     Defendants UF Board of Trustees ratified and condoned the false medical reports, the

institution of a treatment plan before diagnosis, and the solicitation by Defendant Teitelbaum of

false medical reports by unauthorized medical professionals.

62.     There was no probable cause to detain, confine and falsely imprison Dr. Paylan as

witnesses in immediate proximity of Dr. Paylan have testified that there was no evidentiary

support to institute a Marchman Act against Dr. Paylan who was simply standing around,

conversing, and requesting that she be diagnosed before being compelled for a treatment for drug addiction.

63.    As a direct and proximate result of the actions of Defendants Teitelbaum and UF Board of Trustees,  Plaintiff was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property, and was falsely imprisoned at Shands Hospital Psychiatric Unit for more than 8 hours, and endured pain and suffering, lost wages, earnings, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now and continuing into the future.

WHEREFORE, Plaintiff respectfully requests judgment for compensatory damages, a jury trial and for such other and further relief as the Court deems proper.

## COUNT II- 42 U.S.C § 1983 Cause of Action
## VIOLATION OF CIVIL RIGHTS
### (Against All Defendants)

64.    By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

65.    At all times relevant to this Amended Complaint, Defendant Teitelbaum was an agent acting under the direction and control of UF Board of Trustees, and was acting pursuant to its official policies, practice and customs.

66.    Acting under color of law of the authority of state law and pursuant to the official policies, practice and customs, UF Board of Trustees, intentionally, knowingly, or recklessly failed to instruct, supervise, control and/or discipline, on a continuing basis, Defendant Teitelbaum, in his duty to properly engage in diagnostic tools before instituting a treatment plan for alleged substance abuse, from falsely confining and falsely instituting Marchman Acts,

without probable cause, and from submitting false affidavits to secure Marchman Acts. Said failures caused or substantially contributed to the damages herein.

67.     UF Board of Trustees, directly or indirectly, under color of state law, approved or ratified the unlawful, deliberate, malicious and/or reckless and wanton conduct of Defendant Teitelbaum, by failing to conduct any competent investigation, take any corrective action, provide any reprimands, or in any way provide subsequent supervision and remedial measures such that the only conclusion that could be drawn from the facts is that UF Board of Trustees condoned said actions.

68.     As a direct and proximate result of the actions of Defendant UF Board of Trustees, Plaintiff was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property,  and was falsely imprisoned and confined at Shands Lock-Down Psychiatric Unit for more than 8 hours, endured pain and suffering, lost wages, earnings, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now and continuing into the future.

        **WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, a jury trial and for such other and further relief as the Court deems proper.

### COUNT III- 42 U.S.C § 1983 Cause of Action
### <u>VIOLATION OF CIVIL RIGHTS</u>
### FOURTH AMENDMENT VIOLATION
### (Against All Defendants)

69.     By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

70.     At all times relevant to this Amended Complaint, Defendant Teitelbaum was an agent acting under the direction and control of UF Board of Trustees, and was acting pursuant to its official policies, practice and customs.

71.     Acting under color of law of the authority of state law and pursuant to the official policies, practice and customs, Defendant Teitelbaum  intentionally, knowingly, or recklessly directed, ordered and instructed staff at the Florida Recovery Center to conduct an unlawful and unconsented search of both Plaintiff's person and possessions.

72.     Personal items which belonged to Plaintiff were retrieved after the search of Plaintiff's suitcases and purse  and were then retained by staff at the Florida Recovery Center. These personal items included but were not limited to cell phone, iPad, toiletry items such as hair spray bottles, nail polish, and other canned items for hair and body care and wash which Plaintiff had packed as part of her travel away from her home as she normally would in the ordinary course of any trip away from her home.

73.     Said search and seizure was unlawful and unconsented and caused damages described herein.

74.     Staff who conducted the search and seizure at the Florida Recovery Center were direct employees of UF Board of Trustees and thus acting under direct instruction, ratification and approval by Defendant UF Board of Trustees in their unlawful and unconsented search of Plaintiff's person and possessions.

75.     As a direct and proximate result of the actions of Defendants Teitelbaum and UF Board of Trustees, Plaintiff was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property, endured pain and suffering, invasion of privacy, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now and continuing into the future.

WHEREFORE, Plaintiff respectfully requests judgment for compensatory damages, a jury trial and for such other and further relief as the Court deems proper.

**COUNT IV**
**RETALIATION**
**(Against Defendant Scott Teitelbaum, MD)**

76.     By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

77.     Upon realization of the unlawful practices engaged in by Defendant Teitelbaum and the Florida Recovery Center, Plaintiff began to object vehemently. Specifically, during the second visit, Plaintiff was expressing her objections about the unlawful practices employed by Defendant Teitelbaum, where Plaintiff was  in plain sight and earshot of other visitors and new arrivals.

78.     These objections included but were not limited to, Defendant Teitelbaum, improperly compelling all visitors to pay an initial fee of $3000 under the pretense that the cost would be used for purposes of diagnostic testing. The lack of any  diagnosis or evaluation, and immediate admission into group therapy sessions were also among the objections raised by Plaintiff, loud enough where other visitors were able to hear and understand Plaintiff's objections, and where other visitors also began to question the practices of Teitelbaum subsequent to Plaintiff's objections. Plaintiff also objected to lack of definitive testing such as hair testing that would conclusively establish a history of substance abuse by showing results as far back as three months. Plaintiff voiced that these appropriate tests were not being performed because the motive by Defendant Teitelbaum was to generate revenue at the cost of professionals being scared of losing their licenses.

79.     Because of these boisterous objections, remarks and inquiries about the excessive charge of  $3,000 to perform simple hair testing and blood work, Defendant Teitelbaum accused Plaintiff of inciting a riot among the visitors. Defendant Teitelbaum also became threatened that

18

his power at the Center may be perceived as diminished, his unlawful practices exposed, which then triggered Teitelbaum to take the subsequent retaliatory actions against Plaintiff.

80.     Thereafter, Defendant Teitelbaum began to employ methods and tactics to prove to Plaintiff and other visitors that Defendant Teitelbaum was in control of the premises. In response to Plaintiff's legitimate concerns and objections to the methods employed at the Florida Recovery Center in processing individuals suspected of having substance abuse disorder, Defendant Teitelbaum began to describe Plaintiff as a drug addict who was out of control and in denial. Teitelbaum's retaliation was immediate, absolute and out of malice.

81.     One of Defendant's retaliatory acts against Plaintiff was placing Plaintiff under Marchman Act in front of all the staff and visitors so as to appear in control of the situation and the objections raised by Plaintiff which Teitelbaum perceived as inciting a riot at the Florida Recovery Center. Opening other visitors' eyes was not helpful for Teitelbaum's objectives and pocket financially and thus Defendant Teitelbaum retaliated against Plaintiff out of sheer malice and greed.

82.     As part of the retaliation, Defendant Teitelbaum also solicited  false medical reports and false medical opinions from Dr. David Myers , Dr. Michael Herkov, and Dr. William Green, who were all associated with the PRN program.

83.     These solicitation acts by Teitelbaum were in violation of Plaintiff's HIPAA rights as a patient at the Florida Recovery Center.

84.     The retaliatory solicitation of false medical reports and false medical opinions  by Defendant Teitelbaum  helped Defendant Teitelbaum  paint a picture of Plaintiff that was consistent with a drug addict, and consistent with a doctor who was dangerous to the public,

which Defendant Teitelbaum used to deflect the attention that Plaintiff was bringing to Defendant Teitelbaum and his unlawful practices at the Florida Recovery Center.

85.    The false claim that a videotape existed allegedly showing Dr. Paylan injecting the controlled substance Demerol into her veins was another retaliatory act by Teitelbaum which sealed the deal in getting Plaintiff's medical license suspended  for a period of eight months, until an administrative law judge threatened to relinquish jurisdiction of  the administrative complaint filed as without basis if the Department of Health could not produce this alleged videotape. Within days of the administrative law judge's statements, the suspension of Plaintiff's medical license was lifted and Teitelbaum's lie was exposed but not before Plaintiff suffered immensely both professionally and financially.

86.    As a direct and proximate result of the unlawful and malicious retaliatory actions of Defendant Teitelbaum, Plaintiff suffered injury, was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property and was falsely imprisoned at Shands Psychiatric Lock Down Unit for more than 8 hours, subjected to sudden emergency suspension of her medical license, and loss of existing and prospective patients,  and endured pain and suffering, lost wages, earnings, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now, and continuing into the future.

       **WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, a jury trial and for such other and further relief as the Court deems proper.

## COUNT IV
## FALSE IMPRISONMENT
### (Against All Defendants)

87.    By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

20

88.     As a result of Defendants' actions, Dr. Paylan was transported to confinement from Florida Recovery Center to Shands Hospital and placed in a restricted 'lock-down' Psychiatric Unit where Plaintiff was prohibited from leaving on her own will. This confinement lasted more than 8 hours and it was unlawful and based on fabricated information asserted by Defendant Teitelbaum.

89.     The false imprisonment, false confinement and detainment of Dr. Paylan was pursuant to a Marchman Act instituted by Defendant Teitelbaum and the paperwork filled out by Defendant Teitelbaum to institute the Marchman Act contained intentionally exaggeratedly fabricated information about a videotape existing depicting Plaintiff as injecting herself with Demerol in order so that Defendant Teitelbaum could justify the Marchman Act. No such videotape has been uncovered to date and no such videotape exists.

90.     As a direct and proximate result of the actions of Defendants Teitelbaum and UF Board of Trustees, Plaintiff  was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property, and was falsely imprisoned at Shands Psychiatric Lock-Down Unit for more than 8 hours, endured pain and suffering, lost wages, earnings, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now and continuing into the future.

        **WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, punitive damages, a jury trial and for such other and further relief as the Court deems proper.

**COUNT V**
**FRAUD**
**(Against All Defendants )**

91.    By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

92.    In July of 2011, Plaintiff was instructed through Professional Resource Network, that she had been set up for an appointment at the Florida Recovery Center, with Dr. Teitelbaum on July 21, 2011. A contact person was provided to Plaintiff, who was Nancy Goodwin. Nancy Goodwin identified herself as the assistant to Dr. Teitelbaum, and as an individual who would make her arrival and short stay at the Florida Recovery Center as pleasant as possible. She was an authorized representative of Defendant Teitelbaum and indicated that her actions were all dictated, supervised and directed by Defendant Teitelbaum.

93.    By all accounts from those at the Florida Recovery Center, Plaintiff was told that the center was a legitimate center for the diagnosis and treatment of substance abuse and that the methods employed in diagnosing individuals were state-of-the-art, and according to established standards of practice within the medical field specializing in this area.

94.    In no uncertain terms, Plaintiff was told that if there was no substance abuse disorder, that this would immediately become evident because the center operated efficiently and utilized objective testing. None of these statements would turn out to be true, and instead, it would turn out that these were false statements were made to Plaintiff, in order to lure Plaintiff into the Florida Recovery Center.  In short, Plaintiff was told "come right over, we are going to clear you and send you on your way".

95.    Not knowing that she was being deceived, Plaintiff relied on these representations and notified Ms. Goodwin that she was seeing her own patients till late on the day of July 20, 2011

and that it would not be until later that evening when she could arrive to Gainesville.  Plaintiff

was told to arrive whenever she could that evening, but to do so before 8:00 AM and that she

would be provided with directions for check in to a nearby hotel upon arrival. Plaintiff was told

that she would need to pack for a 2-3 day stay to complete all of the testing.

96.     Nancy Goodwin, as an authorized representative of Defendant Teitelbaum and Defendant

UF Board of Trustees,  further informed Plaintiff that she was speaking on behalf of Dr.

Teitelbaum, and that being his assistant, she was the one dealing  with all the new visitors to the

Florida Recovery Center. Ms. Goodwin further informed Plaintiff that  she would have a folder

with all of the instructions of where to go in the morning, available for Plaintiff along with

information for her hotel check-in at the front receptionist, at the time of Plaintiff's arrival that

evening.   Ms. Goodwin reassured Plaintiff that Plaintiff would be back to seeing her patients in

a 2-3 day period after Plaintiff notified Ms. Goodwin that she had a full surgical schedule for the

following week.

97.     When Defendants, through Nancy Goodwin,  made these statements, they  knew that all

of their statements were false. Not only did Defendants know that these statements were false,

but Defendants also knew that these statements were designed to lure Plaintiff to the Florida

Recovery Center, for the purpose of gaining control over her affairs, locking her up in a

psychiatric unit, and labeling her as a drug addict, without performing any diagnostic testing

necessary to rule in the presence of a substance abuse disorder.

98.     Moreover, Defendant Teitelbaum's pre-existing chronic cocaine abuse and his own

contract with PRN as an admitted abuser was not made known to Plaintiff.  Thus, at the time

Plaintiff agreed to make the trip to Florida Recovery Center for an evaluation by Defendant

Teitelbaum, Plaintiff did not know the substantial treatment programs that Teitelbaum, himself,

had been compelled to undergo in order to save his own medical license in the preceding 7-10 years.

99.     Plaintiff was entitled to an evaluation by an evaluator who did not have the pre-existing diagnosis of substance abuse disorder himself. In fact, ultimately Plaintiff was evaluated by a number of evaluators none of whom had a pre-existing condition of substance abuse disorder and was cleared of any drug addiction, including any propensity of drug addiction based on past medical and psychological history analysis. Plaintiff scored at the lowest possible range for not only,  not having a substance abuse disorder, but also for any propensity or tendency to have a substance abuse disorder sometime in the future. Thus, the evaluator's pre-existing condition did make a difference under these circumstances and Plaintiff was entitled to be notified of Teitelbaum's pre-existing condition of substance abuse disorder prior to her arrival at the Florida Recovery Center for an evaluation by Defendant Teitelbaum. However, this never happened.

100.     The set-up at the Florida Recovery Center was a scam to make money under the disguise of being a successful treatment program for those who were afflicted with substance abuse disorders.

101.     Plaintiff did not know any of this when she was being lured to come to Florida Recovery Center on the night of July 20, 2011. The conversation with Nancy Goodwin deceptively led Plaintiff believe that she was to arrive, be provided with a folder with instructions for the next morning, be shown to her hotel room, spend the night in her hotel room, then after being evaluated , return to her patients to perform cosmetic surgery within a 2-3 day period.

102.     Little did Plaintiff know what was in store for her upon her arrival that night at the Florida Recovery Center.

103.    Therefore, on the night of July 20, 2011, after finishing her patient care duties at her office, Plaintiff packed two suitcases for a 2-3 day trip and left for the approximately 1.5 hour trip to Gainesville from Tampa arriving at the address for Shands Hospital around 2:00 AM. The contents of what Plaintiff packed in her suitcases are important and they were, including but not limited to, 3 bottles of hair spray, one for nourishing the hair, one for styling and one for hold, five separate sets of pant and skirt suit, costume and fine jewelry to match each one of the pant and skirt suits, pajamas, curling iron, nighttime skin care for removing makeup and nourishing the skin, 6 pairs of high heel shoes to match the pant and skirt suits, along with running shoes and three different work-out clothes. The nature of these items were important because even without any objective testing, these items were testament to Plaintiff being in charge of her faculties, and not as someone who is drug addicted, and out of control so as to meet any criteria for a Marchman Act.

104.    After packing these items, and just prior to leaving around 11 PM, Plaintiff once again contacted the staff member at FRC, Nancy Goodwin,  and  upon inquiring whether it had become too late to come, Plaintiff was told that it was not too late and that someone would be there at the FRC to meet her and provide her with the necessary paperwork for the morning as Dr. Teitelbaum's schedule was very busy the next morning. Nancy Goodwin indicated that she wanted to make sure that Plaintiff was seen first thing in the morning so that Plaintiff  could get back to her patients as soon as possible.

105.    When Plaintiff arrived at Shands Hospital on the evening of July 20, 2011, Plaintiff immediately realized that there was no hotel to check in and there was no folder to be provided for next day with instructions and evaluation times.  Plaintiff demanded that the attending physician be called as she insisted a mistake had to have been made. When all was said and

done, Plaintiff was informed that the orders from Dr. Teitelbaum was for Plaintiff to be checked in to the psychiatric 'lock-down' unit, and that all of her possessions would be confiscated, and locked up in a safe place, including her cell phone and iPad, and that Dr. Teitelbaum would be seeing her the next day.

106.    Immediately upon learning this, Plaintiff turned around and ran out towards her car.

107.    When Plaintiff made it to her car, Plaintiff realized that she had left her jacket back at the front desk but Plaintiff did not go back to get it. Plaintiff's fear was insurmountable regarding how instructions were left for her to be admitted to a lock down unit without ever being evaluated, without ever a physician taking a history and doing a physical examination on her. Plaintiff got into her car and drove back to Tampa.

108.    In the morning, Plaintiff immediately contacted PRN who told Plaintiff that Nancy Goodwin would be in touch with her. When Nancy Goodwin contacted Plaintiff, Plaintiff was livid and told Ms. Goodwin about her experience the night before. Nancy Goodwin reassured Plaintiff that there had been a mistake and that she would like to make another appointment for Plaintiff and that she believed the mistake was made because it was so late when Plaintiff showed up, and  that the night shift had the wrong person and wrong instructions. Ms. Goodwin spent a good half an hour on the phone convincing Plaintiff that the events of the night before were truly an honest mistake.

109.    But they were not. Ms. Goodwin, acting on behalf of Teitelbaum and UF Board of Trustees, was doing her job to lure Plaintiff back to Florida Recovery Center for financial gain at the expense of Plaintiff's professional destruction.

110. Plaintiff memorialized the horrific events of the evening in a letter to PRN, Judy Riverbark and the letter was addressed to Bud Westmoreland, a PRN liaison. Bud Westmoreland was in direct contact with both Nancy Goodwin and Defendant Teitelbaum.

111. Upon the reassurances made by agent and employee of Defendant Teitelbaum and UF Board of Trustees that events of the July 20, 2011 would not recur, Nancy Goodwin rescheduled another appointment for Plaintiff at the Florida Recovery Center, but not before Plaintiff wrote another letter dated July 30, 2011 to outline all of her understandings as to what this second trip would consist of. This letter was addressed to Bud Westmoreland but this time also copied to Dr. Teitelbaum. In the letter, Plaintiff specifically bolded and outlined that she would only agree to return if the set up was for purposes of evaluation only.

112. Plaintiff also made sure that she inquired about lab testing and was reassured that all laboratory testing was through an accredited laboratory facility to which she would have access if needed. Defendants reassured Plaintiff that all lab testing performed for the purpose of detection of any controlled substance was performed by this accredited laboratory center.

113. Years later, it would be uncovered that Florida Recovery Center utilized an unaccredited laboratory facility for the processing of all specimens collected from new arrivals such as Plaintiff at the Florida Recovery Center. Moreover, the specimens processed at this unaccredited and uncredentialed laboratory facility in Illinois would be unavailable for re-testing by another accredited laboratory for confirmation purposes.

114. Based on Nancy Goodwin's representations that a mistake had been made, and that Plaintiff would not in any way be taken to any lock down unit, during the evaluation and diagnosis process, Plaintiff made the second appointment at Florida Recovery Center for August 2, 2011. Again, Plaintiff packed her suitcases with the same contents as described in Paragraph

103. At no time prior to August 2, 2011, did Ms. Goodwin, as agent of Defendant Teitelbaum and UF Board of Trustees,  tell Plaintiff not to pack these toiletry items, or that she would be subject to search and seizure of the items in her suitcases and on her person, or that she would be required to turn over her cell phone and iPad, or that she would have to pay $3000 which purportedly was for lab testing, or that Plaintiff would be required to stay at half-way housing contracted through Florida Recovery Center, or that she would be subjected to therapy sessions without first being diagnosed with a diagnosis of substance abuse disorder.

115.    Through Nancy Goodwin, Defendants, knew, once again,  that they were making false statements and that Defendants were making these false statements only to lure Plaintiff to return to Florida Recovery Center. Again, little did Plaintiff know what was in store for her at the Florida Recovery Center for her August 2, 2011 appointment.

116.    Upon arrival to the center, Plaintiff was immediately required to pay  $3000 and was told that this amount would cover the diagnostic and the laboratory testing necessary for the evaluation. Plaintiff requested the name of the laboratory which would be responsible for the testing but was not provided with the name of the laboratory.

117.    Then, Plaintiff was instructed to fetch her suitcases and a staff member conducted a search of Plaintiff's person, suitcases and purse. The staff member went through numerous items in Plaintiff's suitcases and purse consisting of cell phone, iPad, hair spray bottles, body care, nail polish and removed all such items and placed Plaintiff's suitcases and the retrieved items in a locked room. When Plaintiff inquired as to what was going on, Plaintiff was told that these items were not allowed on the premises where Plaintiff would stay.  But Plaintiff was not told not to bring these items at the time of making the appointment with Ms. Goodwin and at no time on the prior occasion either.

118.    Plaintiff inquired about as to what hotel would not allow these items. Deceptively and in order to lure Plaintiff back to Florida Recovery Center, Plaintiff had not been told, prior to her arrival at the Florida Recovery Center,  not to bring her cell phone, iPad or the seized toiletry items.  As Plaintiff later discovered, these canned toiletry items had been identified as sources of potential abuse for those afflicted with  drug addiction and were routinely removed from the environment of an individual who had already been diagnosed with drug addiction. But such was not the case for Plaintiff. Plaintiff had not been diagnosed with drug addiction.

119.    Plaintiff was once again confronted with having to vehemently object to the practices and methods that were being imposed on her with the compulsory search of her person and of the items in her suitcases and purse. Plaintiff immediately asked to speak to Defendant Teitelbaum.

120.    Instead, Plaintiff was told that Defendant Teitelbaum was busy and that Plaintiff needed to complete the check in process by picking up her paperwork of a schedule for an entire week consisting of treatment modalities. These treatment modalities were both for individual and group therapy. The first slot on the schedule required Plaintiff to attend a group therapy session, within half of an hour of her check-in,  where she was asked to stand up, with others in the room, and state the following "Hi, I am Christina I am a drug addict".

121.    Again, Plaintiff objected and voiced the fact that she was never told that this was the set up, and in fact that all representations to her precluded all of the events that she was now being subjected to. Plaintiff left the room, without making any such introduction about herself, and again asked to speak with Defendant Teitelbaum.

122.    This then led to exchange that was outlined in preceding paragraphs 32-38  between Plaintiff and Defendant Teitelbaum.

123.     Plaintiff vehemently objected and notified Defendant Teitelbaum that this was not what she was told would happen, with respect to the evaluation process for ruling out a substance abuse disorder. Plaintiff told Teitelbaum that she would not have made the trip for the second time had she known that there were going to be no diagnostic tests to be performed, and that someone was going to go through her suitcases and purse and remove her personal items.

124.     Plaintiff also objected that an expectation had existed for  Plaintiff to stand up and introduce herself as "Hi I am Christina, I am a drug addict" prior to any diagnosis of Plaintiff being  a drug addict.    Like the other incidents, Plaintiff had not been notified that she would be expected to attend to such a group therapy session and be forced to make such false statements as "Hi I am Christina, I am a drug addict" without first a proper diagnosis.

125.      Indeed, the second appointment proved to consist of no diagnostic evaluation to rule out substance abuse. And indeed, it was clear again to Plaintiff that this set up was not at all what she was told by Nancy Goodwin.

126.     As Plaintiff continued to object vehemently to these methods employed  by Defendants, Defendant Teitelbaum expressed that Plaintiff was inciting a riot at the Florida Recovery Center and that she was insulting Defendant Teitelbaum. Teitelbaum told Plaintiff that she was not recognizing Defendant Teitelbaum's powers over her, and his power over her ability to practice her profession as a cosmetic surgeon, and proceeded to institute a Marchman Act to confine Plaintiff, against her will,  in the same psychiatric unit that she had run away from less than one week prior.

127.     It was not until Plaintiff was able to get a hold of her attorney who was able to secure her departure from the psychiatric locked down unit that Plaintiff was able to leave the 'lock down' unit where she was confined for eight hours.

128.    Little did Plaintiff know however, that when she left, Defendant Teitelbaum would further characterize Plaintiff's behavior as resistance to be evaluated even though no such evaluation was ever intended to be undertaken and that Teitelbaum would then deposit this false description of the events to both the Board of Medicine and a local newspaper which would publish the information obtained from Florida Recovery Center and Defendant Teitelbaum.

129.    The end result was that Plaintiff, on two separate occasions, was fraudulently led to believe that she was going to be evaluated to rule out a substance abuse disorder and that she was going to be staying at a hotel during the course of the evaluation. Based on the representations made by Defendants, Plaintiff made the two appointments at Florida Recovery Center, during both visits the representations of Defendants turned out to be false and only for the purpose of luring Plaintiff onto the premises for the financial gain of Defendants.

130.    On both occasions, after being fraudulently lured to return, none of the representations made by Defendants occurred and Plaintiff not only ended up paying $3000 out of her pocket, but also ended up being improperly admitted into a lock down psychiatric unit, being searched in her person and possessions, and her possessions seized, all of which led to mental anguish, humiliation, shock, severe emotional distress, fear, and reputational damages.

131.    As a direct and proximate result of the fraudulent actions and representations of Defendants, Plaintiff was deprived of her right to be secure in her person, and property against unreasonable search and seizure of her property,  was falsely imprisoned at Shands Psychiatric Lock-Down Unit for more than 8 hours, had to pay $3000 out of pocket, which was never refunded despite Defendants having performed no evaluation on Plaintiff, endured pain and suffering, lost wages, earnings, mental anguish, humiliation, injury to professional reputation, and other lawful damages, then, now,  and continuing into the future.

**WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, punitive damages, and a jury trial and for such other and further relief as the Court deems proper.

## COUNT VI
## DEFAMATION BY SLANDER AND LIBEL
## (Against Defendant Scott Teitelbaum, M.D.)

132.   By this reference, Plaintiff repeats and re-alleges the foregoing Paragraphs 1-54, as if the same were fully set forth at length herein.

133.   When Plaintiff objected to the unlawful practices that she saw at the Florida Recovery Center, and under the supervision and direction of Defendant Teitelbaum, Defendant Teitelbaum believed that he could stop Plaintiff from creating the attention that Plaintiff was expressing around Teitelbaum and his unlawful practices, by publishing false statements to the media, specifically to Tampa Bay Times newspaper, to staff at the Florida Recovery Center, to PRN staff, such as Bud Westmoreland, and to the Florida Board of Medicine and to the Department of Health.

134.   In fact, after finding out about the scam and leaving the premises from the second visit in August 2011, Defendant Teitelbaum paved the way for a compelled mental examination of Plaintiff by falsely claiming to the media, the Department of Health, the Florida Board of Medicine and to PRN staff, that Plaintiff was mentally unstable, drug addicted and in denial as a result of Plaintiff's affliction with drug addiction, unfit to practice medicine, and danger to the public.

135.   As a result of these false representations by Defendant Teitelbaum, in October of 2011, a newspaper article was generated which was disparaging about Plaintiff and which described Plaintiff as a drug addicted doctor, who had escaped from treatment, and was dangerous to the

welfare of the public and was refusing to be evaluated by Defendant Teitelbaum and Florida

Recovery Center. When in reality, Plaintiff was objecting to Defendant Teitelbaum and UF

Board of Trustees' practices of putting Plaintiff into a treatment program without first properly

diagnosing Plaintiff with an alleged substance abuse disorder. Defendants twisted Plaintiff's

objections into false state of denial and refusal for treatment for drug addiction that never existed

in Plaintiff. In doing so, Defendants defamed Plaintiff by slander and by libel. The libelous

statements were made in a letter dated August 2, 2011 written by Defendant Teitelbaum.

136.    Plaintiff was not refusing to be evaluated but rather was complaining of not being

evaluated before being thrown into treatment programs, being searched in her person and

property and being thrown into a lock down psychiatric unit.

137.    When these misrepresentations by Defendant Teitelbaum were published in the Tampa

Bay Times, Plaintiff suffered irreparable harm to her good reputation, was labeled as a drug

addict, when she was not, was labeled as a dangerous doctor when she was not. Moreover,

Plaintiff was portrayed as having a psychiatric illness by Defendant Teitelbaum in order to

further disparage Plaintiff in the eyes of the media and in the eyes of her existing and prospective

patients.

138.    These false representations by Teitelbaum resulted in the Department of Health seeking a

compelled mental examination. An action was then initiated in Hillsborough County Circuit

Court.

139.    There, a state court judge ruled that Plaintiff was not to be placed into any treatment

program unless a proper diagnosis was first made about whether or not Plaintiff had a substance

abuse disorder.

140.    However, it was too late as Plaintiff's reputation had been severely damaged by the false statements of Defendant Teitelbaum published in the media and among health professionals and patients of Plaintiff.

141.    As a direct and proximate result of the false and defamatory statements by Defendant Teitelbaum, Plaintiff suffered irreparable harm to her reputation and to this day, fights various sources which come out of the woodwork claiming that Plaintiff is a drug addict or drug dealer which are a direct result of the ongoing damage Plaintiff has incurred  as a direct result of Defendant Teitelbaum's actions.

   **WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, punitive damages, and a jury trial and for such other and further relief as the Court deems proper.

   **AS TO ALL CLAIMS, WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

(a) An order granting compensatory damages in an amount  to be determined at trial but estimated to be no less than two million dollars ($2,000,000.00);

(b) An order issuing a declaratory judgment finding that Defendants UNIVERSITY OF FLORIDA BOARD OF TRUSTEES conducted unlawful transactions compelling their employees and agents to institute unlawful and unconsented search and seizure of person and property of Plaintiff

(c) An order issuing a declaratory judgment finding that Defendants SCOTT TEITELBAUM, MD  and UNIVERSITY OF FLORIDA BOARD OF TRUSTEES conducted treatment plans without diagnosis, and false treatment of patients without diagnosis at the Florida Recovery Center all of which constituted fraud upon Plaintiff;

(d) An order of injunctive relief precluding Defendants TEITELBAUM and UNIVERSITY OF FLORIDA BOARD OF TRUSTEES  from operating the Florida Recovery Center under its past and current arrangements of  treating without first diagnosing individuals who are referred to the center to rule out substance abuse disorders;

(e) An order awarding punitive damages in an amount no less than thirty million dollars ($30,000,000) to be proven at time of trial;

(f) An order awarding such other further relief as the Court may deem just and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Fed. R.Civ. Proc 38, Plaintiff demands a trial by jury on all counts. Plaintiff seeks monetary damages in an amount no less than $32,000,000 million dollars, in compensatory and punitive damages.

Dated: April 20, 2016

Respectfully Submitted,

*/s/ Christina Paylan*
_____
CHRISTINA PAYLAN, M.D.
3801 S. Macdill Avenue
Tampa, Florida 33611
Tel: (813) 877-8183
Fax: 813-877-8166
Cell: (813) 919-6299
*Email: drpaylan@bodytuck.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 20, 2016, I caused the foregoing document to be filed through CM/ECF system which will then send out an electronic notification to Counsel of record for Defendants, and specifically to  John Jopling, Esq. at email jjopling@dellgraham.com. And to Jamie White, Esq. at jwhite@dellgraham.com

/s/ Christina Paylan

CHRISTINA PAYLAN, M.D.