IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHRISTINA PAYLAN, M.D.,

      Plaintiff,

v.                                              CASE NO. 1:15-cv-159-MW-GRJ

SCOTT TEITELBAUM, M.D.,

      Defendant.

_____/

## **REPORT AND RECOMMENDATION**

This matter is before the Court on ECF No. 120, Defendant Scott

Teitelbaum, MD's Motion for Summary Judgment, and ECF No. 122,

Plaintiff's Motion for Summary Judgment. Both parties have filed

responses to the motions for summary judgment and a reply, if any. (ECF

Nos. 146, 159, 162.) The motions are, therefore, ripe for review. For the

reasons explained below, the undersigned recommends that Defendant's

motion for summary judgment be granted and Plaintiff's motion for

summary judgment be denied.[1]

---

[1] Plaintiff also filed ECF No. 168, Plaintiff's Request for Oral Argument for Motion
and Cross-Motion for Summary Judgment. Because the Court finds that oral argument
is not necessary to resolve these motions, Plaintiff's request, ECF No. 168, is **DENIED.**

# I.  INTRODUCTION

Plaintiff ("Dr. Paylan"), a cosmetic surgeon, is proceeding *pro se*

pursuant to a complaint alleging claims under 42 U.S.C. § 1983 and

Florida law. (ECF No. 31 ("Compl.").) Dr. Paylan's remaining claims[2]

against Defendant ("Dr. Teitelbaum") center around her visit to the Florida

Recovery Center in July and August 2011 for a substance abuse

evaluation by Dr. Teitelbaum. Based on her visits to the Florida Recovery

Center, Dr. Paylan alleges that Dr. Teitelbaum violated her civil rights by

fabricating evidence, Marchman Acting her, and unlawfully searching and

seizing her property. Dr. Paylan also alleges that Dr. Teitelbaum falsely

imprisoned her and committed fraud. (Compl. at 5–31.)

Dr. Teitelbaum filed a motion for summary judgment. (ECF No. 120.)

In support of Dr. Teitelbaum's motion, he submitted excepts of depositions,

evaluations of Dr. Paylan by various doctors, orders of emergency

suspension in 2011 and 2014, correspondences regarding Dr. Paylan, and

other notes, forms, and declarations. (ECF Nos. 119-1–119-25.)

---

[2] The Court has addressed multiple motions to dismiss and motions for summary judgment. (ECF Nos. 6, 9, 16, 31, 33, 67.) Over the course of the proceedings, the Court dismissed two Defendants (the University of Florida and UF & Shands Recovery Center) as improperly named parties, one Defendant (UFBOT) based on Eleventh Amendment immunity, and Plaintiff's retaliation and defamation claims. (ECF Nos. 21, 25, 60, 61, 92, 95.)

Dr. Paylan submitted her own motion for summary judgment. (ECF No. 122.) In support of her motion for summary judgment, Dr. Paylan submitted affidavits and declarations,[3] email correspondences, excerpts of depositions, the Marchman Act document, a copy of the police report from August 2, 2011, and other reports, state-court documents, and drug test results. Dr. Paylan also included some of the same evidence that Dr. Teitelbaum used in support of his motion for summary judgment. (ECF Nos. 124-1–124-38.)[4]

Other evidence was included in support of each party's response to the motions for summary judgment. These exhibits consist of additional deposition excerpts, email correspondences between the parties, documents regarding Dr. Paylan's education, other letters, and pictures

---

[3] Dr. Teitelbaum objects pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure to the declaration of Dr. Lawrence Masten (ECF No. 124-20) and W.S. (ECF No. 124-33) because these individuals were not timely disclosed as witnesses. The undersigned agrees and has not considered those exhibits in ruling on the motions for summary judgment in this case.

[4] Dr. Teitelbaum also objects pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure to Dr. Paylan's submission of the LinkedIn profile of Joseph Jones (ECF No. 124-32), the social media posts regarding Dr. Teitelbaum (ECF No. 124-36), and the documents regarding Dr. Teitelbaum's substance abuse history (ECF No. 124-37) as inadmissible. The undersigned agrees and has not considered those exhibits in ruling on the motions for summary judgment in this case.

taken during investigations of Dr. Paylan. (ECF Nos. 149, 158, 160.)[5]

## II.  EVIDENCE[6]

The filings and evidence provided in support thereof encompass events spanning from 2010 to present. Because the only remaining claims against Dr. Teitelbaum involve Dr. Paylan's visits to the Florida Recovery Center in July and August of 2011, the relevant evidence is summarized as follows.

Dr. Paylan is a cosmetic surgeon in Tampa, Florida. Dr. Paylan was arrested on June 9, 2011, for trafficking in illegal drugs, possession of a controlled substance, and possession of a drug without a prescription.[7] This arrest led to an investigation by the Florida Department of Health

---

[5] Months after the filing of the motions for summary judgment and corresponding responses, Plaintiff filed ECF No. 176, Plaintiff's Supplement Filing of New Evidence Disputing Defendant's Claims in Motion for Summary Judgment and Rule 56(f) Motion to Reopen Discovery. Because Plaintiff did not seek leave to file supplemental evidence and because the evidence is irrelevant to the remaining claims in this case, Plaintiff's new evidence is **STRICKEN** and her motion to re-open discovery, ECF No. 176, is **DENIED.**

[6] As a note, the page number for all citations to depositions is the page number printed in black in the top right-hand corner of the relevant page of the deposition transcript, rather than the page number that corresponds with the document number that appears in header of each exhibit.

[7] Although these charges were later dismissed, Dr. Teitelbaum was not aware of that fact during Dr. Paylan's August visit to the Florida Recovery Center. (ECF No. 124-1 at 1; ECF No. 124-3 at 9; ECF No. 124-5.)

("DOH").[8] As a result of this investigation, Dr. Paylan was referred by a

DOH investigator to the Professional Resource Network ("PRN").[9] Bud

Westmoreland of PRN informed Dr. Paylan that she needed to withdraw

from the practice of medicine and submit to a substance abuse evaluation

with an approved provider or PRN would recommend to DOH that DOH

suspend her medical license. One of the approved providers was Dr.

Teitelbaum, the medical director of the Florida Recovery Center. (Compl. at

5; ECF No. 119-1 at 6, 15; ECF No. 119-3 at 31; ECF No. 119-7 at 2; ECF

No. 119-17; 119-19; ECF No. 124-1 at 1; ECF No. 124-3 at 4.)

On July 1, 2011, Dr. Paylan was arrested again, this time in the

Atlanta airport. Although Dr. Paylan says this arrest was a result of a

suspicion that she was fleeing the country after liquidating her assets, the

arrest warrant actually resulted from Demerol prescriptions that Dr.

Paylan's fiancé attempted to pick up. That same day PRN advised Dr.

Paylan that she needed to schedule her evaluation in three days and that if

---

[8] "The Department of Health . . . is the state agency charged with regulating the practice of medicine, pursuant to Section 20.43, Florida Statutes (2010-2011), and Chapters 456 and 458, Florida Statutes (2010-2011)." (ECF No. 119-14.)

[9] "P.R.N. evaluates impaired practitioners for [DOH] in accordance with Section 456.076, Florida Statutes." (ECF No. 119-14 at 5.) Further, "PRN is a non-profit organization funded through a contract with DOH . . . and through charitable contributions" and is a consultant to DOH. (ECF No. 119-16 at 5.)

she did not, PRN would refer Dr. Paylan's case to DOH for appropriate

disciplinary action. (ECF No. 119-2 at 52–53; ECF No. 119-7 at 2; ECF No.

119-16.)

For this evaluation, on July 13, 2011, Dr. Paylan first visited Dr.

Myers, a private physician and owner of HealthCare Connection who

appeared on the PRN-approved list of providers. During this evaluation, Dr.

Paylan provided a hair sample. A few hours into the evaluation, however,

Dr. Paylan left and withdrew all medical releases. Dr. Myers informed Dr.

Paylan that she was not safe to practice medicine until she completed an

inpatient evaluation. (ECF No. 119-1; ECF No. 119-4 at 28; ECF No. 119-

7.)

Dr. Myers' report regarding Dr. Paylan includes findings from his

short evaluation and information he received from DOH investigators. For

example, Dr. Myers noted that a DOH investigator said there was a video

showing track marks on Dr. Paylan's arms and Demerol bottles and

needles strewn around her house. Additionally, Dr. Myers stated that

Plaintiff's hair tested positive for metabolites of Demerol at high levels. He

concluded:

> Dr. Paylan currently meets DSM-IV criteria for opioid abuse and
> may meet criteria for dependence as well but her guarded

attitude during her evaluation today in conjunction with her lack
of willingness to allow contact with collateral sources of
information make it impossible to provide a definitive
assessment at this time.

He recommended that Dr. Paylan undergo an inpatient evaluation. (ECF
No. 119-7.)

Upon learning of Dr. Paylan's failure to complete her evaluation, Dr.
Paylan informed Mr. Westmoreland that she would complete an inpatient
evaluation at the Florida Recovery Center.[10] Dr. Paylan then failed to report
to the Florida Recovery Center as scheduled on multiple occasions,
leading PRN to threaten Dr. Paylan that they would seek an emergency
suspension of her medical license if she did not immediately report for an
evaluation. (ECF No. 119-1 at 28–29, 32–33.)

Finally, on July 21, 2011, Dr. Paylan arrived at the Florida Recovery
Center at 2:00 a.m. Upon her arrival she was informed that she would be
admitted overnight to the inpatient unit.[11] Because Dr. Paylan believed she

---

[10] According to Dr. Teitelbaum, Dr. Paylan was referred to the Florida Recovery
Center "by both PRN of Florida and the Department of Health." (ECF No. 119-5 at 30.)

[11] According to Dr. Paylan, Dr. Teitelbaum had orders for her to be placed in a
"lockdown unit" upon her arrival at the Florida Recovery Center. She claims that this
order had nothing to do with the time of her arrival. (ECF No. 119-2 at 152; ECF No.
124-1 at 2.) Dr. Teitelbaum testified, however, that anyone who arrives after hours
cannot stay in one of the apartments and therefore must either go to the inpatient unit
or return the next day for assessment. (ECF No. 119-5 at 116–18.)

would be permitted to stay in a hotel rather than be admitted, she left the Florida Recovery Center. (Compl. at 5–6; ECF No. 119-2 at 148, 152–53; ECF No. 124-1 at 2.)

Dr. Judy Rivenbark, the Medical Director of PRN, sent a letter to DOH on July 25, 2011, stating that Dr. Paylan "is a serious and immediate danger to the citizens of the State of Florida." This letter resulted from Dr. Paylan's arrest history, positive drug test, and her refusal to be evaluated. PRN then closed its file on Dr. Paylan. (ECF No. 119-14 at 7; ECF No. 119-18; ECF No. 119-19.)

Dr. Paylan returned to the Florida Recovery Center on August 1, 2011. When Dr. Paylan was checking in to the facility, she filled out forms for voluntary admission as well as to release medical records, including the report from Dr. Myers' evaluation in July. Additionally, a staff member of the Florida Recovery Center searched her belongings and took her cell phone, iPad, keys, and other personal items. After Dr. Paylan was admitted, nurse Carole Johnson obtained urine and hair samples, and Dr. Teitelbaum and Dr. Abraham met with Dr. Paylan regarding her substance use history and the circumstances surrounding her evaluation. (Compl. at 6; ECF No. 119-2 at 274, 283; ECF No. 119-5 at 42–43; ECF No. 119-20;

ECF No. 124-1 at 2–3; ECF No. 124-7 at 36; ECF No. 124-10 at 11–12.)

The events of August 2, 2011, are a little more unclear based on the evidence submitted. According to Dr. Paylan, she asked Nancy Goodwin to speak with Dr. Teitelbaum at 7:30 a.m., but Ms. Goodwin told her to wait until about 2:30 p.m. to speak with him. Dr. Paylan was then directed into a group therapy session, and upon seeing individuals introduce themselves as drug addicts, Dr. Paylan returned to Ms. Goodwin asking for her iPhone and iPad and stating that she would wait in the reception area because she did not belong in group therapy. When it became clear that Dr. Paylan's possessions were not going to be returned to her, she called the Gainesville Police. Once the Gainesville Police arrived, Dr. Teitelbaum allegedly became enraged and instituted the Marchman Act in retaliation. (Compl. at 6–7; ECF No. 124-1 at 3–4; ECF No. 124-31.)

According to Dr. Teitelbaum, however, Dr. Paylan decided she wanted to leave the Florida Recovery Center, so she barged into Dr. Teitelbaum's office at 7:30 a.m., saying she was not a drug addict and that she wanted to leave. Dr. Paylan was told to wait until the afternoon, but she refused. She told Nancy Goodwin that she revoked her authorization for the evaluation, and Ms. Goodwin informed Dr. Teitelbaum. According to

Ms. Goodwin, during that morning Dr. Paylan was angry, upset, and very loud. After Dr. Paylan called the police, the police then met with Dr. Teitelbaum. (ECF No. 119-8 at 5; ECF No. 119-14 at 8; ECF No. 119-23; ECF No. 124-3 at 50; ECF No. 124-8 at 24–28.)

Dr. Teitelbaum then instituted a Marchman Act against Dr. Paylan, which resulted in Dr. Paylan's transportation to a psychiatric unit at Shands Hospital, where she was held for between four and eight hours.[12] According to Dr. Teitelbaum, he instituted the Marchman Act because Dr. Paylan had a license to practice medicine and posed an immediate threat to the people in Florida. He based this determination on his interactions with her, Dr. Myers' evaluation,[13] and a DOH report.[14] Dr. Teitelbaum said

---

[12] The Marchman Act form, entitled "Physician Certificate for Emergency Admission," was filled out and signed by Dr. Joel Abraham, not Dr. Teitelbaum. (ECF No. 124-6.) Although Dr. Teitelbaum made the decision that a Marchman Act was appropriate, Dr. Abraham agreed with that determination. (ECF No. 124-7 at 55–57.)

[13] Dr. Myers' report was typed on July 15, 2011. (ECF No. 119-4 at 50.) According to a fax cover sheet, Dr. Myers' evaluation was sent to Dr. Teitelbaum either on the evening of August 1, 2011 or the morning of August 2, 2011. (ECF No. 149-14 at 4–5; ECF No. 158-1 at 2.) Dr. Teitelbaum was, therefore, able to utilize this report when making the determination to Marchman Act Dr. Paylan.

[14] Prior to Marchman Acting Dr. Paylan, Dr. Teitelbaum received a report from Bud Westmoreland. This report mentions Dr. Paylan's arrests, the DOH's investigator's statement that there is a video showing Dr. Paylan and her fiancé in a stupor with track marks on their arms as well as bottles of Demerol and needles strewn around, Dr. Myers' recommendation of an inpatient evaluation, and the warning Dr. Paylan received that if she did not report for an evaluation by July 20, 2011, PRN would request that her medical license be suspended. (ECF No. 119-17.)

he wanted to inform DOH of his findings before letting Dr. Paylan leave so that they could make a decision as to what to do about Dr. Paylan's medical license. Further, Dr. Teitelbaum said that he told Dr. Paylan that the purpose of the Marchman Act was to complete the evaluation, but she refused to complete any further evaluation and instead threatened to sue.[15] (Compl. at 7–10; ECF No. 119-2 at 274; ECF No. 119-5 at 62, 100–02; ECF No. 119-14 at 7–8; ECF No. 124-6; ECF No. 124-7 at 55–56.)

After Dr. Teitelbaum notified DOH regarding his interactions with and evaluation of Dr. Paylan, he felt comfortable enough to let Dr. Paylan leave. He specifically notified DOH because DOH makes the decision regarding taking way or suspending a physician's medical license. Although Dr. Paylan says no diagnostic steps were taken during her Marchman Act aside from asking whether she was suicidal, it is undisputed that Dr. Teitelbaum then discharged Dr. Paylan after a period of only hours. Dr. Teitelbaum also informed Dr. Paylan that it was his recommendation that she not practice medicine until fully evaluated. (ECF No. 119-5 at 62, 100–02; ECF No. 124-1 at 4.)

---

[15] Dr. Paylan admits that she threatened to sue Dr. Teitelbaum. (ECF No. 124-1 at 4.)

In Dr. Teitelbaum's letter to DOH, he stated that based on the information he received as part of Dr. Paylan's evaluation, he "feel[s] comfortable with reasonable medical certainty that she cannot practice medicine with reasonable skill and safety at this time." Dr. Teitelbaum stated that he interacted with her on both days of her evaluation. Dr. Teitelbaum also noted the positive hair test for Demerol, Dr. Myers' evaluation, criminal charges against her, the items seized from her home, and bruises on her arms. (ECF No. 119-23.)[16]

On August 5, 2011, DOH issued an order to suspend Dr. Paylan's medical license. In support of this order, DOH cited investigations and findings of the Tampa Police Department, including a list of items seized during the execution of a search warrant (syringes, Demerol, etc.), the DOH investigator's findings, Dr. Paylan's failure to complete an evaluation, a positive drug test, and Dr. Teitelbaum's report regarding her August 2011 evaluation at the Florida Recover Center. (ECF No. 119-14.)

---

[16] Dr. Teitelbaum eventually drafted a formal report of his August evaluation of Dr. Paylan. In this report, he concluded that he could "say with reasonable medical certainty that she cannot practice with reasonable skill and safety." He based this determination on her drug-related behaviors, which included injecting herself with medications and injecting her fiancé with narcotics; her impaired judgment, as evidenced by injecting herself intravenously, injecting her fiancé at home with Demerol, and prescribing controlled substances for her fiancé's son; and her mood lability and disruptive behavior. Dr. Teitelbaum believed that she needed to complete her evaluation before she could be considered to practice medicine again. (ECF No. 119-8.)

Dr. Paylan's last interaction with Dr. Teitelbaum was during her October 2011 visit to the Florida Recovery Center, where she was fully evaluated for a substance abuse disorder following a court order requiring Dr. Paylan to be evaluated at the Florida Recover Center. None of her remaining claims relate to this October 2011 evaluation. (Compl. at 10–11; ECF No. 119-2 at 48, 265, 269.)

### III.  SUMMARY JUDGEMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the entry of summary judgment is appropriate when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988).

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must

then come forward with "sufficient evidence of every element that he or she

must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987).

The non-moving party may not simply rest on the pleadings, but must

use affidavits, depositions, answers to interrogatories, or other admissible

evidence to demonstrate that a material fact issue remains to be tried. *See*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v.*

*Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005).

> In civil actions filed by inmates, federal courts must distinguish
> between evidence of disputed facts and disputed matters of
> professional judgment. In respect to the latter, our inferences
> must accord deference to the views of prison authorities.
> Unless a prisoner can point to sufficient evidence regarding
> such issues of judgment to allow him to prevail on the merits,
> he cannot prevail at the summary judgement stage.

*Beard v. Banks,* 548 U.S. 521, 530 (2006). Conclusory allegations based

on subjective beliefs are insufficient to create a genuine issue of material

fact. *See, e.g., Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d

1275, 1279 (11th Cir. 2001).

The Court must view the evidence and inferences drawn from the

underlying facts in the light most favorable to the non-movant. *Earley v.*

*Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). But, "when

opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (internal quotations and citations omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (stating that to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff"). "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n. 12 (11th Cir.1988) ("The summary judgment standard requires that we resolve all reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner.").

## IV.  DISCUSSION

Dr. Teitelbaum argues that he is entitled to summary judgment on Dr. Paylan's remaining claims, which include the following: (1) § 1983 claim for fabrication of evidence; (2) § 1983 claim for an unlawful Marchman Act; (3) § 1983 claim for an unlawful search and seizure of Dr. Paylan's belongings; (4) a state-law claim for false imprisonment; and (5) a state-law claim for fraud.  He contends that he is entitled to summary judgment

on the three remaining § 1983 claims because he was not a state actor under § 1983, because he did not violate any of Dr. Paylan's rights, and because he is entitled to qualified immunity. Dr. Teitelbaum also argues that he is entitled to summary judgment on Dr. Paylan's two state-law claims because Dr. Paylan has failed to prove the necessary elements for false imprisonment and fraud. (ECF No. 120.)

Dr. Paylan argues that she is entitled to summary judgment because there is no dispute that Dr. Teitelbaum wrote three false reports, fabricated evidence, solicited Dr. Myers to submit a false report, and used fabricated evidence and false reports to support his decision to institute a Marchman Act despite the fact that statutory criteria was not met. (ECF No. 122.)

For the reasons discussed below, the undersigned finds that Dr. Teitelbaum's motion for summary judgment is due to be granted and Dr. Paylan's motion for summary judgment is due to be denied.

### A. Dr. Teitelbaum acted under color of state law and, therefore, may be liable under 42 U.S.C. § 1983 if he violated Dr. Paylan's federal or constitutional rights.

Dr. Teitelbaum argues that while he was interacting with Dr. Paylan, he was not acting pursuant to any power he possessed by state authority and instead acted as an independent examiner. Further, Dr. Teitelbaum

argues that PRN referred Dr. Paylan to Dr. Teitelbaum and that his involvement with Dr. Paylan was "merely coincidental" to his state employment. Accordingly, Dr. Teitelbaum argues that he was not a state actor acting under color of state law and, therefore, Dr. Paylan cannot bring her § 1983 claims against him. (ECF No. 120 at 12–13.)

In response, Dr. Paylan argues that all of her interactions with Dr. Teitelbaum were while he was acting in his capacity as the Medical Director of the Florida Recovery Center, which is operated by the University of Florida Board of Trustees. Dr. Paylan also argues that the fact that Dr. Teitelbaum appeared on the list of PRN-approved providers does not convert his actions into those of an independent evaluator. Ultimately, she argues that Dr. Teitelbaum was acting under duties and authority resulting from his state employment; therefore, he was acting under color of state law. (ECF No. 146 at 10–11.)

"In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the

state." *Id*.

"To constitute state action, 'the deprivation must be caused by the

exercise of some right or privilege created by the State . . . or by a person

for whom the State is responsible,' and 'the party charged with the

deprivation must be a person who may fairly be said to be a state actor.'"

*West v.* Atkins, 487 U.S. 42, 49 (1988) (quoting *Lugar v. Edmondson Oil

Co.*, 457 U.S. 922, 937 (1982)). Typically state employment is sufficient to

deem a defendant a state actor. *West*, 487 U.S. at 49; *Edwards v. Wallace

Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995). However, not everything

done by a state employee is considered to be done under color of state

law. *Almand v. DeKalb Cty, Ga.*, 103 F.3d 1510, 1513 (11th Cir. 1997).

Notably, "a defendant in a § 1983 suit acts under color of law when he

abuses the position given to him by the State." *Griffin*, 261 F.3d at 1303.

Therefore, the important question "is whether the official was acting

pursuant to the power he/she possessed by state authority or acting only

as a private individual." *Almand v. DeKalb Cty, Ga.*, 103 F.3d 1510, 1513

(11th Cir. 1997) (quoting *Edwards*, 49 F.3d at 1523).

At the time of the alleged violations, Dr. Teitelbaum was a state

employee of the University of Florida, a state university. (Compl. at 2; ECF

No. 66 at 2; ECF No. 124-3 at 4.) His titles included "Vice-Chair of the Department of Psychiatry, Chief of Addiction Medicine, Medical Director of Florida Recovery Center, and Associate Professor." (ECF No. 124-3 at 4.) In his interactions with Dr. Paylan, Dr. Teitelbaum's relevant title was Medical Director of Florida Recovery Center. (Compl. at 2.) It was based on this position that Dr. Teitelbaum oversaw Dr. Paylan's evaluations at the Florida Recovery Center in July, August, and October of 2011. He was, therefore, acting pursuant to power he possessed from state authority during all relevant events in this case and thus a state actor.

Dr. Teitelbaum's conduct was not that of an independent medical examiner simply because Dr. Paylan learned of Dr. Teitelbaum and the Florida Recovery Center from PRN. Although PRN is a non-state entity, it is funded in part by a contract with DOH, a state agency, and it evaluates impaired practitioners for DOH. (ECF No. 119-14 at 5; ECF No. 119-16.) Additionally, it was DOH that originally referred Dr. Paylan to PRN, and Dr. Teitelbaum testified that both PRN and DOH referred Dr. Paylan to the Florida Recovery Center. (ECF No. 119-1 at 6; ECF No. 119-5 at 30; ECF No. 119-7 at 2; ECF No. 119-17; 119-19; ECF No. 124-1 at 1.) Lastly, Dr. Teitelbaum acknowledged that the important entity for him to contact

regarding his evaluation of Dr. Paylan was DOH, not PRN. (ECF No. 119-5 at 102.) Thus, despite Dr. Teitelbaum's claims to the contrary, he was acting as a state employee whose responsibility was to evaluate Dr. Paylan and report his findings to DOH.

Accordingly, Dr. Teitelbaum was acting under color of state law and therefore may be held liable under § 1983 for any deprivation of a federal or constitutional right. The question that remains is whether Dr. Teitelbaum deprived Dr. Paylan of any constitutional or federal rights. He did not for the following reasons.

## B. Dr. Teitelbaum is entitled to summary judgment on Dr. Paylan's three claims pursuant to § 1983 because Dr. Teitelbaum did not violate any of Dr. Paylan's constitutional or federal rights.

Dr. Teitelbaum also argues that Dr. Paylan has failed to prove that he violated any of her rights with regard to the three remaining § 1983 claims: (1) fabrication of evidence, (2) an improper Marchman Act, and (3) unlawful search and seizure. Each claim is discussed in turn below.

### 1. Fabrication of Evidence

Dr. Paylan alleges that Dr. Teitelbaum fabricated evidence to support the Marchman Act he instituted against her. The fabrication of evidence,

according to Dr. Paylan, consisted of Dr. Teitelbaum's claim he had a videotape that showed Dr. Paylan injecting Demerol into her veins and writing and soliciting false medical reports to justify the Marchman Act. As a result of this alleged fabrication of evidence, Dr. Paylan contends that she was unlawfully confined in a psychiatric unit. (Compl. at 13–15; ECF No. 122 at 12–16; ECF No. 146 at 12–16.)

The fundamental problem with this claim is that Dr. Paylan has not submitted any evidence supporting her claim of fabrication of evidence. The Eleventh Circuit has stated that "a court need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 n.8 (11th Cir. 2004) (citing *Cunningham v. Gates*, 229 F.3d 1271, 1291–92 (9th Cir. 2000)).

Dr. Paylan's allegation that Dr. Teitelbaum fabricated video evidence showing Dr. Paylan using Demerol is refuted by the evidence in the record. Dr. Teitelbaum never said or represented to anyone that he had a video of Dr. Paylan using Demerol or even that he had seen such a video. To the contrary, his report from his August 2011 evaluation of Dr. Paylan merely references that a video exists that "allegedly show[s] Dr. Paylan and her fiancé Joe in a stupor as well as noting tract marks on their arms." (ECF

No. 119-8 at 2.)  This reference to a video is consistent with information that Dr. Teitelbaum received from Mr. Westmoreland of PRN and Dr. Myers prior to Dr. Teitelbaum's evaluation of Dr. Paylan that also references this alleged video. (ECF No. 119-7; ECF No. 119-17.)

Further, regardless of whether any such video actually existed, Dr. Teitelbaum testified that none of his conclusions or the institution of the Marchman Act were based on this alleged video. (ECF No. 124-3 at 23–24.)   While it is true that the Marchman Act document references such a video, Dr. Abraham, not Dr. Teitelbaum, filled out and signed the form. (*See* 124-6.) The video is also only one of many other pieces of factual support for the Marchman Act. (*Id.*) Dr. Paylan has not provided anything to the contrary that would support a claim that Dr. Teitelbaum fabricated this video evidence or that as a result of any such fabrication Dr. Paylan was deprived of any constitutional rights.

Dr. Paylan's allegation that Dr. Teitelbaum drafted false medical reports is also contradicted by the evidence. Dr. Teitelbaum's letter, his own reports, and his decision to Marchman Act Dr. Paylan were based on information available to him at that time that he received from others, including a DOH investigator and Dr. Myers, as well as his own personal

interactions with Dr. Paylan. (ECF No. 119-5 at 100–101; ECF No. 119-8; ECF No. 119-23.) Relying upon and referencing information he received from others fails to constitute fabrication of evidence. And in the absence of any evidence submitted by Dr. Paylan supporting her claim that Dr. Teitelbaum wrote false medical reports, her claim fails.

To the extent that Dr. Paylan argues that Dr. Teitelbaum's reports are false because he knowingly relied upon unreliable information, this argument also fails. For example, Dr. Paylan argues that Dr. Teitelbaum should not have relied on information he received from Mr. Westmoreland at PRN or from Dr. Myers' report because he knew these sources were not credible or reliable. (ECF No. 146 at 4, 12–13.) Because Dr. Teitelbaum had no reason not to consider this information he was entitled to consider this information in his evaluation of Dr. Paylan. (*See* ECF No. 119-8; ECF No. 160-2; ECF No. 160-6 at 51–52.) In sum, Dr. Paylan has failed to prove that any information Dr. Teitelbaum relied upon was actually unreliable. And because Dr. Teitelbaum properly relied upon all the information available there is no evidence to support the claim that  Dr. Teitelbaum drafted false medical reports.

Dr. Paylan's unsupported allegation that Dr. Teitelbaum

"orchestrated a concerted scheme" during which he convinced Dr. Myers

and others to write false reports has no evidentiary support in the record.

Dr. Myers evaluated Dr. Paylan in July 2011 before she visited the Florida

Recovery Center. (ECF No. 119-7.) Dr. Myers testified that he dictated his

report that same day based on his own evaluation of Dr. Paylan and that it

was later transcribed. (ECF No. 158-1 at 50–52.) He then signed the report

on August 2, 2011, when he sent the report to Dr. Teitelbaum. (ECF No.

158-1 at 51.) Dr. Paylan again offers no evidentiary support—testimonial or

otherwise—to support her conclusory claim that Dr. Teitelbaum solicited

Dr. Myers or any others to write false reports.[17]

Because Dr. Paylan has not provided any evidence to support a

claim that Dr. Teitelbaum fabricated evidence or that he caused anyone

else to do so and because the evidence contradicts this claim, Dr.

Teitelbaum is entitled to summary judgment on Plaintiff's fabrication of

evidence claim.

### 2. Marchman Act

Dr. Paylan also alleges that Dr. Teitelbaum unlawfully instituted an

---

[17] Notably, Dr. Paylan even signed a release to allow Dr. Teitelbaum to obtain her records from Dr. Myers' evaluation during her time at the Florida Recovery Center. (ECF No. 160-2.)

unlawful Marchman Act against her. Dr. Paylan says that Dr. Teitelbaum did not evaluate her and instead relied upon fabricated or nonexistent evidence to justify the Marchman Act. Dr. Paylan argues that this violates the legal criteria of the Marchman Act because she did not pose any immediate threat and because there was no evidence of intoxication or loss of judgment due to intoxication that would have justified a Marchman Act. (Compl. at 15–16; ECF No. 122 at 12–16; ECF No. 146 at 17–20.)

"The Marchman Act, Fla. Stat. § 397.675, allows the involuntary commitment of an individual if there is a good-faith reason to believe that she has lost self-control due to substance abuse and either may cause harm to herself or others or is in need of substance-abuse services." *Walters v. Freeman*, 572 F. App'x 723, 725 (11th Cir. 2014); *see also* Fla. Stat. § 397.675 (2016) (stating the statutory criteria for a Marchman Act). Further, under Florida law, any individual who acts "in good faith, reasonably, and without negligence" in instituting a Marchman Act "shall be free from all liability, civil or criminal, by reason of such acts." *See* Fla. Stat. § 397.501(10)(b).

If a person is properly held pursuant to a Marchman Act based on the criteria in § 397.675, Florida Statutes, that action is "not unlawful or in violation of his constitutional rights." *Jordan v. Tucker*, No.

3:09cv227/LC/CJK, 2012 WL 662285, at *8 (N.D. Fla. Jan. 26, 2012).

That does mean that an unlawful Marchman Act could not constitute a violation of an individual's constitutional rights. For example, involuntary commitment, such as a commitment under the Marchman Act, is a deprivation of liberty and as such is subject to the protections of due process. *See O'Connor v. Donaldson*, 42 U.S. 563 (1975). Notably, Dr. Paylan does not reference any specific constitutional right that Dr. Teitelbaum violated by instituting the Marchman Act; she merely alleges that it was unlawful and a violation of her civil rights because it was based on fabricated information.[18]

Dr. Teitelbaum's institution of a Marchman Act was in accordance with the statutory criteria in § 397.675, Florida Statutes. Dr. Teitelbaum testified that he instituted the Marchman Act based on the information he had prior to instituting the Marchman Act—his personal interactions with Dr. Paylan, information he received from PRN and DOH, and the report from Dr. Myers' evaluation of Dr. Paylan—and his belief that because Dr. Paylan had an active medical license, she posed an immediate threat to others. (ECF No. 119-5 at 100–02; ECF No. 119-23; ECF No. 124-6.)

---

[18] Again, as discussed above, the undersigned does not find any evidence that Dr. Teitelbaum fabricated any information, either in support of the Marchman Act or otherwise.

Additionally, in a letter to DOH on the day he instituted the Marchman Act,

Dr. Teitelbaum stated that he based the filing of the Marchman Act on "the

significant concern that she is a danger to herself, about her drug use and

about her being a threat to the citizens of Florida as she has an active

license to practice medicine." (ECF No. 119-23.)

Dr. Teitelbaum's personal interactions with Dr. Paylan included the

following. Dr. Teitelbaum met with Dr. Paylan for at least one hour on

August 1, 2011. (ECF No. 119-5 at 42–43; ECF No. 119-23; ECF No. 124-

7.) Then, on August 2, 2011, at 7:30 a.m., Dr. Paylan appeared in Dr.

Teitelbaum's office upset and requesting to leave. (ECF No. 119-5 at 100;

ECF No. 119-8 at 6; ECF No. 119-23.) Rather than waiting until the

afternoon as Dr. Teitelbaum suggested, Dr. Paylan called the police, and

after the police arrived Dr. Teitelbaum instituted the Marchman Act. (ECF

No. 119-8 at 6; ECF No. 119-23; ECF No. 124-6.) Dr. Teitelbaum said that

throughout her time at the Florida Recovery Center Dr. Paylan was

threatening and specifically threatened to sue Dr. Teitelbaum and Shands

on multiple occasions. (ECF No. 119-23.)

Dr. Teitelbaum also received other information about Dr. Paylan prior

to the Marchman Act, including a correspondence from Mr. Westmoreland

of PRN and the evaluation previously performed by Dr. Myers.[19] (ECF No.

119-7; ECF No. 119-17.) Based on the PRN correspondence, Dr.

Teitelbaum was aware that there was a DOH investigation of Dr. Paylan,

that Dr. Paylan had been arrested multiple times including for possession

of a controlled substance without a prescription, that there was allegedly a

video showing Dr. Paylan in a stupor with Demerol and needles strewn

about the house, and that employees had allegedly quit due to Dr. Paylan's

drug use. (ECF No. 119-17.)

Dr. Myers' report from his evaluation of Dr. Paylan was also

revealing. The report showed major discrepancies between Dr. Paylan's

portrayal of the facts underlying the DOH investigation and her past arrests

and the DOH investigator's portrayal. Additionally, although Dr. Paylan had

initially cooperated in the evaluation, she only completed one day of the

evaluation and revoked all releases. The results of Dr. Paylan's hair test

were "positive for Meperidine (Normeperidine) @ > 4,000 pg/mg with a

cutoff of 500 pg/mg." Psychological testing evidenced that Dr. Paylan was

evasive and guarded and displayed a tendency toward avoiding accurate

---

[19] The date on the letter from Mr. Westmoreland is July 21, 2011. (ECF No. 119-17.) The fax header on Dr. Myers' evaluation says August 1, 2011, at 22:10. (ECF No. 119-7.) Both of these dates are before the Marchman Act instituted on August 2, 2011.

self-disclosure. In addition to other findings, Dr. Myers concluded that Dr.

Paylan met the "DSM-IV criteria for opioid abuse and may meet the criteria

for dependence as well but her guarded attitude during her evaluation . . .

in conjunction with her lack of willingness to allow contact with collateral

sources of information make it impossible to provide a definitive

assessment." At the close of his evaluation, Dr. Myers recommended an

inpatient evaluation. Further, he stated that he informed Dr. Paylan that

she was not safe to practice medicine until she was evaluated. (ECF No.

119-7.)

The Marchman Act lasted for a brief period of time—approximately

four hours. According to Dr. Teitelbaum, the purpose of the Marchman Act

was to continue the evaluation of Dr. Paylan, but she refused to participate

in any further evaluation. (ECF No. 119-5 at 62.) Dr. Teitelbaum only kept

Dr. Paylan involuntarily committed long enough to notify DOH so that they

could take any appropriate actions regarding Dr. Paylan.[20] (ECF No. 119-5

at 102; ECF No. 119-23.) After he notified DOH, Dr. Teitelbaum told Dr.

Paylan that it was his recommendation that she could not practice with

---

[20] This letter was faxed to Ms. Kim at DOH on August 2, 2011, at 18:10. (ECF No. 119-23.)

reasonable skill and safety, and then he discharged her. (ECF No. 119-5 at 62–63, 102; ECF No. 119-23.)

Based on the foregoing, the Court has no trouble concluding that Dr. Teitelbaum had a good faith reason to believe that Dr. Paylan was substance abuse impaired and because of such impairment she had lost self-control with respect to substance abuse and posed a danger to others. *See* Fla. Stat. § 397.675.[21] Dr. Paylan's argument that the decision to institute the Marchman Act was based on fabricated evidence and false reports is unsupported by the evidence. Because the Marchman Act was lawful based on the statutory criteria and Dr. Teitelbaum's evidence and explanation in support thereof, Dr. Paylan cannot show that Dr. Teitelbaum violated any of her rights.[22] Therefore, Dr. Teitelbaum is entitled to summary judgment on this claim.

---

[21] Additionally, because there is ample evidence that Dr. Teitelbaum acted in good faith, reasonably, and without negligence in instituting the Marchman Act against Dr. Paylan, he cannot be held liable resulting from the decision. *See* Fla. Stat. § 397.501(10)(b).

[22] Dr. Thomas Fowlkes also testified to the following: "And so all of those reasons taken together were certainly a good faith reason to have a reason to believe that a substance abuse problem existed." (ECF No. 119-6 at 109.) And with regard to the Marchman Act, he stated, "So [Dr. Teitelbaum] had plenty of reasonable grounds to do that, yes." (*Id.* at 160.)

### 3. Unlawful Search and Seizure

Dr. Paylan also alleges that Dr. Teitelbaum directed, ordered, and instructed staff at the Florida Recovery Center to conduct an unlawful and unconsented search of Dr. Paylan and her belongings. During this search, staff took Dr. Paylan's cell phone, iPad, and toiletry items. Dr. Paylan says that as a result of this search and seizure, she was deprived of her right to be secure in her person and property against unreasonable search and seizure of her property, she endured pain and suffering, an invasion of privacy, mental anguish, humiliation, and injury to her professional reputation. (Compl. at 16–17; ECF No. 122 at 7–9; ECF No. 146 at 20.)

The Fourth Amendment, which is applied to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. 4; *Ker v. California*, 374 U.S. 23, 30, 33 (1963). Notably, "The Fourth Amendment prohibits only unreasonable searches. Unreasonableness is determined by a case-by-case balancing of the state's interests against the individual's." *Lenz v. Winburn*, 51 F.3d 1540, 1551 (11th Cir. 1995) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985)). "[T]he standard of reasonableness is the same under the

Fourth and Fourteenth Amendments." *Ker*, 374 U.S. at 33.

For starters, Dr. Paylan does not allege, nor does any of the evidence show, that Dr. Teitelbaum personally searched or seized anything from her. Instead, Dr. Paylan alleges that Dr. Teitelbaum merely instructed other staff to search her. (Compl. at 16–17.) Because Dr. Paylan's allegations involve a search and seizure performed by an individual other than Dr. Teitelbaum, Dr. Paylan has failed to show that Dr. Teitelbaum violated her Fourth Amendment rights.

Further, Dr. Paylan has failed to show that the search was unreasonable. Dr. Paylan voluntarily admitted herself to the Florida Recovery Center for a substance abuse evaluation. (ECF No. 119-20.) As a facility that provides substance abuse treatment, it has an interest in ensuring that no one brings in contraband or illegal substances, which is why the admission forms Dr. Paylan signed include that "[t]he service provider may take temporary custody of your personal effects . . . for medical or safety reasons." (*Id.* at 4.) Both medical and safety reasons exist for the search of Dr. Paylan and the confiscation of Dr. Paylan's keys, iPad, and certain toiletry items during the course of her stay at the Florida

Recovery Center.[23] Thus, the Court finds that the search and seizure of Dr. Paylan's person and belongings was reasonable in light of the circumstances of Dr. Paylan's admission to the Florida Recovery Center for substance abuse evaluation, and Dr. Paylan has provided no evidence that shows otherwise.

Because Dr. Teitelbaum did not search Dr. Paylan or seize any items from her and because the search of Dr. Paylan and seizure of her personal items was reasonable, Dr. Paylan cannot show that Dr. Teitelbaum violated any of her rights. Thus Dr. Teitelbaum is entitled to summary judgment on this claim.

### 4. Dr. Teitelbaum is entitled to summary judgment on Dr. Paylan's three claims pursuant to § 1983 because Dr. Teitelbaum is entitled to qualified immunity.

In addition to arguing that Dr. Teitelbaum is entitled to summary judgment because Dr. Paylan failed to prove that he violated any of her federal constitutional or statutory rights as is necessary to prove a § 1983 claim, Dr. Teitelbaum argues that he is entitled to qualified immunity because he did not violate any rights of which a reasonable person would

---

[23] Dr. Paylan even testified that other patients had their belongings searched as was the normal course of admission. (ECF No. 119-2 at 173.)

have known. More specifically, Dr. Teitelbaum asserts that he acted reasonably throughout all of his interactions with Dr. Paylan. (ECF No. 120 at 18–21.)

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Andujar v. Rodriguez,* 486 F.3d 1199,1202 (11th Cir. 2007) (citations omitted); *Brandon v. Holt,* 469 U.S. 464, 472–73 (1985). Further, qualified immunity is only available in suits for damages. *See, e.g., Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) ("Qualified immunity shields federal and state officials from money damages"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official wishing to invoke the affirmative defense of qualified immunity must have been acting within his discretionary authority. *Skop v. City of Atlanta, Georgia,* 485 F.3d 1130, 1136 (11th Cir. 2007). If a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not proper. *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002).

There are two prongs to a qualified immunity test. The plaintiff must

show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir. 2004). The U.S. Supreme Court has held that lower courts are permitted to exercise discretion in deciding which prong of the test to address first. *Pearson v. Callahan,* 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

Notably, in addressing the defense of qualified immunity in a motion for summary judgment, the Eleventh Circuit has stated that "[i]n each circumstance, taking the facts known to the particular defendant, 'the relevant question . . . is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.'" *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996) (quoting *Stewart v. Baldwin Cty. Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir. 1990)). Further, "courts are to remain mindful that the doctrine is intended to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Leeks v. Cunningham*, 997 F.2d 1330, 1334 (11th Cir. 1993) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As a threshold matter, it is undisputed that Dr. Teitelbaum was acting

within his discretionary authority as Medical Director of the Florida

Recovery Center during his interactions with Dr. Paylan.  Because Dr.

Teitelbaum has established that he was acting in his discretionary

authority, the burden shifts to Dr. Paylan to show that qualified immunity is

improper.

Although as discussed above Dr. Paylan has failed to show that Dr.

Teitelbaum violated any of her constitutional rights, even assuming that Dr.

Paylan could show that Dr. Teitelbaum violated a constitutional right when

he Marchman Acted her,[24] the Court finds that Dr. Paylan has not shown

that any such right was clearly established, as required.

"The violation of a constitutional right is clearly established if a

reasonable official would understand that his conduct violates that right."

*Walters v. Freeman*, 572 F. App'x 723, 729 (11th Cir. 2014). "A right may

be clearly established for qualified immunity purposes in one of three ways:

(1) case law with indistinguishable facts clearly establishing the

constitutional right; (2) a broad statement of principle within the

---

[24] Because Dr. Paylan provided no evidence that proves Dr. Teitelbaum
fabricated evidence, drafted false reports, or recruited others to do the same, and
because Dr. Teitelbaum did not personally search Dr. Paylan or seize any of her
belongings, the undersigned focuses the qualified immunity inquiry only on Dr. Paylan's
§ 1983 claim regarding the Marchman Act.

Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

Dr. Paylan has not produced any case law at all, let alone any cases with indistinguishable facts clearly establishing a constitutional right regarding the institution of a Marchman Act for a few hours during a substance abuse evaluation where, based on information provided and interactions with the individual, the individual found the Marchman Act appropriate. Nor has Dr. Paylan submitted anything else to show that a clearly established right was violated—she does not even allege any specific amendment of the Constitution that Dr. Teitelbaum violated in instituting the Marchman Act. Dr. Paylan has also not alleged that the conduct in question is so egregious that a right was clearly violated, even in the total absence of case law.

Instead, Dr. Paylan merely makes the conclusory argument that Dr. Teitelbaum cannot show that he was acting reasonably or in good faith. (ECF No. 146 at 20–24.) And in doing so she relies on the affidavit of Dr.

Richard Hoffman, her expert witness, who never says that Dr. Teitelbaum

acted in bad faith; he merely reaches a different conclusion with regard to

whether Dr. Paylan had a substance abuse impairment. (ECF No. 150-15.)

Dr. Paylan also again inappropriately alleges that Dr. Teitelbaum

should not have relied on the information provided by PRN or DOH, (*see*

ECF No. 146 at 24), but this allegation is unsupported and contradicted by

a record that provides no reason to doubt the reliability of the information

Dr. Teitelbaum received regarding Dr. Paylan. Therefore, Dr. Paylan has

failed to meet her burden to show that any rights she alleges were violated

were clearly established.

Further, the Court finds that the evidence shows Dr. Teitelbaum

acted reasonably in believing his actions were lawful in light of clearly

established law and the information he possessed at the time he

Marchman Acted Dr. Paylan.  As discussed above, Dr. Teitelbaum made

his decision to Marchman Act Dr. Paylan based on information he received

from PRN and the DOH, the evaluation he received from Dr. Myers, and

his own interactions with Dr. Paylan. Based on this information, Dr.

Teitelbaum had a reasonable belief that Dr. Paylan had a substance abuse

problem and presented a danger to others if Dr. Teitelbaum let her leave

the Florida Recovery Center. This reasonable belief led Dr. Teitelbaum to institute a Marchman Act for a brief period of a few hours for the purpose of notifying the DOH. Tthis conduct was reasonable and not clearly unlawful at the time.[25] *See Cannon v. Macon Cty.*, 1 F.3d 1558, 1564 (11th Cir. 1993) ("If a reasonable official in [the defendant's] position could have believed his actions were lawful in light of clearly established law at the time the conduct occurred, immunity applies.").

Accordingly, the undersigned concludes that Dr. Teitelbaum is entitled to qualified immunity; therefore, he is entitled to summary judgment with regard to Dr. Paylan's § 1983 claims.

### C. Dr. Teitelbaum is entitled to summary judgment on Dr. Paylan's false imprisonment claim because his institution of the Marchman Act was both lawful and reasonable.

Dr. Teitelbaum also argues that he is entitled to summary judgment with regard to Dr. Paylan's claim that Dr. Teitelbaum falsely imprisoned her in violation of Florida law when he instituted the Marchman Act against her because he acted in accordance with the law and reasonably under the circumstances. (ECF No. 120 at 21–25.)

Dr. Paylan argues that Dr. Teitelbaum instituted a Marchman Act that

---

[25] Dr. Fowlkes testified that Dr. Teitelbaum had "plenty of reasonable grounds" to implement the Marchman Act. (ECF No. 119-6 at 160.)

caused her to be transported from the Florida Recovery Center to a "lock down" psychiatric unit where she was prohibited from leaving at her own will. Dr. Paylan alleges that this confinement was unlawful in violation of Florida statutes, based on fabricated information, and lasted more than eight hours. Further, Dr. Paylan argues that the statutory good faith immunity is inapplicable to Dr. Teitelbaum because there were no grounds for the Marchman Act. (Compl. at 20–21; ECF No. 122 at 12–16; ECF No. 146 at 24–26.)

Under Florida law, false imprisonment "is the unlawful restraint of a person against his will, the gist of which is the unlawful detention of the plaintiff and the deprivation of his liberty." *Kilpatrick v. United States*, 578 F. Supp. 2d 1339, 1351 (N.D. Fla. 2008) (quoting *Maybin v. Thompson*, 606 So. 2d 1240, 1241–42 (Fla. Dist. Ct. App. 1992)). Further, "[t]he detention must have been 'unreasonable and unwarranted under the circumstances.'" *Id.* (quoting *Rivers v. Dillards Dep't Store*, 698 So. 2d 1328, 1331–32 (Fla. Dist. Ct. App. 1997)).

As discussed at great length above, Dr. Teitelbaum's institution of the Marchman Act was not unlawful or unreasonable and instead was proper under Florida's involuntary commitment statute. *See* Fla. Stat. § 397.675.

He relied on his own interactions with Dr. Paylan as well as reliable information he received from others, including PRN, DOH, and Dr. Myers, in making his good faith determination that a Marchman Act was necessary. *See id.* Further, the evidence amply demonstrates that Dr. Teitelbaum acted in good faith, reasonably, and without negligence in instituting the Marchman Act against Dr. Paylan, thus freeing him from any liability resulting from the decision. *See* Fla. Stat. § 397.501(10)(b).  Dr. Paylan has failed to offer any evidence that proves otherwise. Therefore, Dr. Teitelbaum is entitled to summary judgment on Dr. Paylan's state-law false imprisonment claim.

### D. Dr. Teitelbaum is entitled to summary judgment on Dr. Paylan's fraud claim because he did not make any false or misleading statements to Dr. Paylan.

Lastly, Dr. Teitelbaum argues that he is entitled to summary judgment on Dr. Paylan's fraud claim because he did not make any false or misleading statements to Dr. Paylan. Further, he argues that he is entitled to summary judgment because Dr. Paylan did not rely on any false or misleading statements in coming to the Florida Recovery Center. (ECF No. 120 at 25–27.)

Dr. Paylan alleges that Nancy Goodwin, Dr. Teitelbaum's assistant,

made false statements to Dr. Paylan to lure her to the Florida Recovery

Center. According to Dr. Paylan, Ms. Goodwin represented to Dr. Paylan

that the center was efficient and utilized objective testing. Additionally, Ms.

Goodwin told Dr. Paylan she would be provided directions to a nearby

hotel to stay at after she checked into the Florida Recovery Center,

including instructions for the next morning. Ms. Goodwin also told Dr.

Paylan that she would be back to seeing patients in a two- to three-day

period. Dr. Paylan says that Ms. Goodwin knew these statements were

false and that she said them to lure her to the Florida Recovery Center for

the purpose of gaining control over Dr. Paylan, locking her in a psychiatric

unit, and labeling her a drug addict—all without performing any diagnostic

testing to determine whether she had a substance abuse disorder. (Compl.

at 22–32; ECF No. 146 at 26–27.)[26]

Like with Dr. Paylan's unsupported Fourth Amendment search and

seizure claim, Dr. Paylan does not allege that Dr. Teitelbaum personally

made any of the allegedly false statements that lured her to the Florida

Recovery Center. Instead, Dr. Paylan alleges that Ms. Goodwin was

---

[26] In addition to what she was told, Dr. Paylan alleges that she was not informed that Dr. Teitelbaum had a pre-existing substance-abuse issue, which she should have been informed of prior to arriving at the Florida Recovery Center for an evaluation by him. (Compl. at 23–24.)

responsible for these false statements. Ms. Goodwin, however, is not a

defendant in this case. Because Dr. Paylan cannot prove that Dr.

Teitelbaum committed fraud, he is entitled to summary judgment on Dr.

Paylan's fraud claim.

Further, Dr. Paylan cannot prove the elements of a fraud claim. To

succeed on a fraudulent misrepresentation claim under Florida law, Dr.

Paylan must prove the following elements: "(1) a false statement

concerning a material fact; (2) the representor's knowledge that the

representation is false; (3) an intention that the representation induce

another to act on it; and (4) consequent injury by the party acting in

reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla.

2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)).

Even if Dr. Paylan could prove that Dr. Teitelbaum was responsible

for any false statements to her, Plaintiff has failed to provide any evidence

that proves any false statement was made for the purpose of inducing her

to act on it or that she actually relied on any false or misleading statement

in visiting the Florida Recovery Center. Rather than being fraudulently

induced to go to the Florida Recovery Center, Dr. Paylan was advised by

Mr. Westmoreland that she needed to undergo a substance abuse

evaluation to maintain her medical license in Florida. (ECF No. 119-1 at 33; ECF No. 119-2 at 157; ECF No. 119-16.) Additionally, Dr. Paylan testified at her deposition that she visited the Florida Recovery Center due to the recommendation by PRN. (ECF No. 119-2 at 227.) Thus, the evidence is unrefuted that Dr. Paylan visited the Florida Recovery Center for the purpose of undergoing a necessary evaluation to maintain her medical license, not because of any false or misleading statements.

Because Dr. Teitelbaum did not make any false or misleading statements to Dr. Teitelbaum and because Dr. Paylan did not rely on any false or misleading statements in visiting the Florida Recovery Center, Dr. Teitelbaum is entitled to summary judgment on this claim.

## V.  CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

1. Defendant Scott Teitelbaum, MD's Motion for Summary Judgment, ECF No. 120, should be **GRANTED.**

2. Plaintiff's Motion for Summary Judgment, ECF No. 122, should be **DENIED.**

**IN CHAMBERS** this 11th day of January 2018.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**